1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

The Honorable Chief Judge Ricardo S. Martinez

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

ANGELA HOGAN and ANDREA
SEBERSON, on behalf of themselves and
others similarly situated,

Plaintiffs,

v.

AMAZON.COM, INC.,

Defendant.

Case No. 2:21-cv-996-RSM

CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT

JURY DEMAND REQUESTED

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

# Table of Contents

Page

I.    INTRODUCTION ............................................................................. 1

II.   PARTIES ........................................................................................ 12

III.  JURISDICTION AND VENUE ...................................................... 13

IV.   FACTUAL ALLEGATIONS ........................................................... 14

      A.   Unchecked Growth: It's Always Day 1 at Amazon ......................... 14

           1.   Amazon's Prime Strategy of Losing Money to Make Money ................... 14

           2.   The Buy Box Trains Consumers to Click Without Thinking...................... 18

      B.   Fulfillment by Amazon: How to Win Markets and Influence Sellers ............... 22

           1.   Amazon ties Sellers' access to the Buy Box on their paying Amazon for its
                Fulfillment services.................................................................... 24

           2.   Amazon's Seller Fulfilled Prime program illustrates the company's
                anticompetitive double standard. .................................................... 29

           3.   Amazon taxes Sellers to fund the rapid expansion of its logistics business.. 30

           4.   COVID-19: Amazon Unmasked .................................................... 33

      C.   Econ 101: How Amazon's Strong-Arming of Sellers Leads Directly to Higher
           Prices for Consumers.................................................................... 37

           1.   Amazon directs consumers to purchase items from Sellers who use
                Fulfillment by Amazon, even if a non-FBA Seller is offering the item for a
                lower total price. ........................................................................ 38

2.     The Buy Box algorithm's preference for Sellers who purchase Amazon's Fulfillment services decreases price competition among Sellers, resulting in consumers paying higher prices than they would have but for Amazon's unlawful tying arrangement. ........................................................................ 42

3.     Sellers pass on the supra-competitive cost of Fulfillment by Amazon to consumers in the form of higher prices. ........................................................ 42

4.     FBA Sellers' charging consumers higher prices enables Amazon to do the same. ............................................................................................................... 45

D.     Amazon's Reign of Terror Over Sellers ........................................................ 46

V.     CLASS ACTION ALLEGATIONS ............................................................................ 49

VI.    TOLLING OF THE STATUTE OF LIMITATIONS .................................................. 52

A.     Discovery-Rule Tolling ................................................................................. 52

B.     Fraudulent-Concealment Tolling .................................................................. 53

VII.   CLAIMS FOR RELIEF ............................................................................................. 56

Claim 1: Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) –56

Unlawful Tying Arrangement ................................................................................. 56

Claim 2: Violation of Section 2 of the Sherman Act (15 U.S.C. § 2) – Use of

Monopoly Level of Power to Harm Competition Through Tying Scheme ............... 58

VIII.  PRAYER FOR RELIEF ............................................................................................ 61

IX.    JURY DEMAND ...................................................................................................... 62

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– ii –

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Plaintiffs Angela Hogan and Andrea Seberson, on behalf of themselves and all others similarly situated, in their action against Defendant Amazon.com, Inc., allege the following based on personal knowledge, the investigation of counsel, and information and belief.

## I.    INTRODUCTION

1.    This case is about a betrayal of trust. Since its inception in 1994 as an online bookseller operating out of founder Jeff Bezos's garage, Amazon—today a tech behemoth worth $1.6 trillion[1]—has cultivated a relationship with consumers that has garnered the company "astounding" customer loyalty.[2] Ultimately, however, Amazon's nominal mission of "striv[ing] to offer … customers the lowest possible prices, the best available selection, and the utmost convenience" came into direct conflict with Amazon's ambition to dominate every sector of the economy. Faced with a choice between doing right by its customers or gaining market power in one of the many industries it seeks to control, Amazon made the wrong choice, jettisoning its promise of the "lowest possible prices" and violating the antitrust laws in a way that has injured—and continues to injure—hundreds of millions of its loyal customers.

2.    To understand how and why Amazon violated the antitrust laws and betrayed the trust of its customers, one must begin with Amazon Prime, the company's first ever membership program, unveiled in February 2005.[3] At the program's inception, an annual

---

[1] *Amazon Net Worth 2006–2021 | AMZN*, MACROTRENDS (last visited Jan. 19, 2022), https://www.macrotrends.net/stocks/charts/AMZN/amazon/net-worth.

[2] Pamela N. Danzinger, *Amazon's Astounding Customer Loyalty Is Astounding*, FORBES (Jan. 10, 2018), https://www.forbes.com/sites/pamdanziger/2018/01/10/amazons-customer-loyalty-is-astounding/?sh=f42c81511fe3.

[3] *Amazon.com Announces Record Free Cash Flow Fueled by Lower Prices and Free Shipping; Introduces New Express Shipping Program – Amazon Prime*, BUSINESS WIRE (Feb. 2, 2005) (accessed via LEXISNEXIS).

– 1 –

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   membership fee of $79 provided Prime members with unlimited two-day shipping at no

2   extra cost and one-day shipping for $3.99 per item.[4]

3         3.      Amazon CEO Jeff Bezos touted Prime as "all-you-can-eat express shipping."[5]

4   At the time, Amazon's annual revenues were $8.49 billion[6]—only 2.2% of what they are

5   today. Bezos assured investors that, "[t]hough expensive for the Company in the short-

6   term," Prime would pay off in the long-run because "it's a significant benefit and more

7   convenient for customers. With Amazon Prime, there's no minimum purchase to think

8   about, and no consolidating orders—two-day shipping becomes an everyday experience

9   rather than an occasional indulgence."[7]

10        4.      Since its inception, Amazon Prime has been "the linchpin of [the company's]

11  growth strategy," which is why 65% to 70% of all online retail transactions in the United

12  States occur through Amazon.[8] The staggering number of online retail transactions

13  controlled by Amazon translates into Amazon's having a 50% or higher share of U.S. retail

14  e-commerce sales by dollar amount.[9]  The success of Amazon's strategy is further evidenced

15  by the singular customer loyalty of Prime members,[10] of which there are currently more than

16  140 million in the United States.[11]

---

[4] *Id.*

[5] *Id.* (internal quotation marks omitted).

[6] Laurie J. Flynn, *In a Well-Worked Pattern, Amazon's Revenue Rises and Its Profit Drops*, NY TIMES, at C4 (Feb. 2, 2007) (accessed via LEXISNEXIS).

[7] *Id.* (internal quotation marks omitted).

[8] *Investigation of Competition in Digital Markets*, Majority Staff Report and Recommendations, House Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary, at 255 (Oct. 6, 2020) [hereinafter House Subcommittee Report], *available at* https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf.

[9] House Subcommittee Report, *supra* note 8, at 254.

[10] Danzinger, *supra* note 2.

[11] *How Many People Have Amazon Prime*, 99 FIRMS (last visited Jan. 19, 2022), https://99firms.com/blog/how-many-people-have-amazon-prime.

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 2 –

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

5.     The loyalty of Amazon customers is astounding: 96% of Prime members are more likely to buy products from Amazon than from other online retailers, and 89% of consumers who are *not* Prime members are more likely to make a purchase on Amazon.com than on any other e-commerce website.[12]

6.     The "Prime Badge," which appears next to products on Amazon's website that are eligible for free, fast shipping to Prime members, conveys a powerful message to the 142.5 million American consumers who currently pay $12.99 per month for Prime membership: "Trust us. It's authentic. It will get to your doorstep quickly, at no extra charge. You can buy it with a click."[13]



7.     As with traditional brick-and-mortar retail businesses, the biggest factor in running a successful business online is location. And Amazon has the most valuable online real estate for the millions of Sellers who offer their products through Amazon.com: the

---

[12] Kiri Masters, *89% Of Consumers Are More Likely To Buy Products From Amazon Than Other E-Commerce Sites: Study*, FORBES (Mar. 20, 2019), https://www.forbes.com/sites/kirimasters/2019/03/20/study-89-of-consumers-are-more-likely-to-buy-products-from-amazon-than-other-e-commerce-sites/?sh=6471bf5b4af1.
[13] Ron Knox & Shaoul Sussman, *How Amazon Used the Pandemic to Amass More Monopoly Power*, THE NATION (June 26, 2020), https://www.thenation.com/article/politics/amazon-bezos-pandemic-monopoly/.

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM                   – 3 –                   TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  "Buy Box," which is the section on the right side of an Amazon product detail page where

2  customers can add a product to their cart or "buy now":



8.     The importance of the Buy Box to Sellers is evidenced by the fact that—rather

than comparison shopping to see whether another Seller on Amazon's website is offering a

better deal on a product—90% of consumer purchases on Amazon's website are made

through the Buy Box.[14] This is because Amazon has worked hard to create the impression

with consumers that the product offer placed in front of them on Amazon.com—namely,

the offer in the Buy Box—is the best deal on that product.

9.     Unfortunately, this is not true for the many millions of Americans for whom

the company's website is the first and last stop for purchasing everything from a $19.99

package of baby diapers to a $4,999 digital camera.

_____

[14] Leanna Ziebak, *How to Win the Amazon Buy Box in 2021*, TINUITI (Mar. 25, 2020),
https://tinuiti.com/blog/amazon/win-amazon-buy-box/.

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 4 –

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

10. Amazon expanded, and ultimately entrenched, its dominant market power in online retail by sustaining losses for much of its first 20 years—losses that resulted from the company's strategy of engaging in below-cost pricing to engender extreme customer loyalty and ensure that Amazon would become consumers' one-stop-shop.[15]

11. But Amazon's ambitions lay far beyond *just* being the largest online retailer in the world. As Amazon's market power in online retail grew, the company branched out to become (among other things) a marketing platform, a delivery and logistics network, a payment service, a credit lender, an auction house, a major book publisher, a producer of television and films, a fashion designer, a hardware manufacturer, and a leading provider of cloud server space and computing power.[16]

12. To drive its aggressive efforts to expand into—and dominate—these and other markets, Amazon leveraged and exploited its most valuable asset: the immense brand loyalty of its customers. In doing so, Amazon both violated the antitrust laws and harmed hundreds of millions of consumers.

13. In 2006, just one year after launching its Prime membership program Amazon launched Fulfillment by Amazon ("Fulfillment services" or "FBA"), a logistics service that provides warehousing, packing, and shipping to third-party sellers ("Sellers"), who account for over 50% of the items purchased through Amazon.com.[17]

14. From the inception of its Fulfillment services, Amazon's goal was to dominate the $1.5 trillion-per-year shipping and logistics industry. Unlike e-commerce,

---

[15] *See* Lisa M. Khan, *Amazon's Antitrust Paradox*, 126 YALE L.J. 564, 747–53 (2017).

[16] Khan, *Amazon's Antitrust Paradox*, *supra* note 15, at 754.

[17] Tugba Sabanoglu, *Percentage of paid units sold by third-party sellers on Amazon platform as of 1st quarter 2021*, STATISTA (May 7, 2021), https://www.statista.com/statistics/259782/third-party-seller-share-of-amazon-platform/.

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 5 –

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

however, the "logistics [industry was] filled with worthy competitors that ha[d] dominated the industry for a century"—FedEx, UPS, and the U.S. Postal Service.[18]

15.     The question for Amazon was how to quickly gain customers for its Fulfillment services so that it could rapidly expand its logistics footprint.

16.     The company's answer to this question is emblematic of its ruthless and anticompetitive business strategy: Amazon decided to simply force Sellers to purchase its Fulfillment services.

17.     This strategy was viable because of the immense power that Amazon has over Sellers. Of the 2.3 million active third-party Sellers from around the world, about 37%—or 850,000—of Sellers "rely on Amazon as their sole source of income."[19]

18.     The company's power over Sellers stems from its complete control over whether a Seller's product is even *shown* to an Amazon shopper.

19.     Amazon exercises this control through the Buy Box: products offered by sellers with a Prime Badge are placed higher in Amazon's search results and are generally the *only* products featured in the Buy Box, through which 90% of consumer purchases on Amazon.com are made.

20.     To force Sellers to switch to its Fulfillment services, Amazon conditioned a Seller's access to the Prime Badge—and with it, placement in the Buy Box—on a Seller's purchasing Fulfillment by Amazon.

21.     As documented in a report resulting from a year-long investigation by a U.S. House Subcommittee ("House Subcommittee Report"), Sellers need a Prime Badge to "maintain a favorable search result position, to reach Amazon's more than 112 million

---

[18] Erica Pandey, *The race to dominate the $1.5 trillion business of moving stuff*, Axios (May 17, 2019), https://www.axios.com/amazon-race-dominate-logistics-shipping-ups-fedex-dhl-b652dbf0-abef-4505-9630-1107fdacb535.html.
[19] House Subcommittee Report, *supra* note 8, at 249.

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM                    – 6 –                    TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Prime members, and to win the Buy Box,"[20] and purchasing "FBA is functionally the ***only***
way for sellers to get the Prime Badge for their product listings."[21]

22.    In other words, Amazon has forced Sellers to buy its Fulfillment services by
designing its Buy Box algorithm so that "[t]he variable that has the greatest impact on the
Buy Box is the product's fulfillment method. Since Amazon considers its fulfillment service
to have perfect metrics across variables, using Fulfillment By Amazon (FBA) is the easiest
way to increase your chances of winning the Buy Box."[22]

23.    Thus, if two Sellers—one of whom pays for Amazon's Fulfillment services
while the other doesn't—offer the same product on Amazon.com, the Seller who pays
Amazon for Fulfillment services will "win" the Buy Box and make the sale, even if the
competing Seller offers a lower total price and faster, more reliable shipping.

24.    In antitrust terms, Amazon's forcing Sellers into purchasing its Fulfillment
services constitutes an unlawful "tying arrangement." Placement in the Buy Box is the
"tying" product or service and Sellers are the "buyers."[23] Access to the Buy Box is
completely controlled by Amazon, and Amazon's algorithm assures that only products with
the Prime Badge are offered through the Buy Box. Fulfillment by Amazon is the "tied"
product or service, which Sellers must purchase to obtain access to the Buy Box. In short,
"Amazon is tying the outcomes it generates for sellers using its retail platform to whether
they also use its delivery business."[24]

---

[20] House Subcommittee Report, *supra* note 8, at 288.
[21] House Subcommittee Report, *supra* note 8, at 287 (emphasis added).
[22] Eyal Lanxner, *The Amazon Buy Box: How It Works for Sellers, and Why It's So Important*,
BIGCOMMERCE (last visited Jan. 19, 2022), https://www.bigcommerce.com/blog/win-
amazon-buy-box/.
[23] Technically, Amazon is limiting access to the Prime Badge. But the Prime Badge is
what gains a Seller access to the Buy Box, where the sale is made.
[24] Khan, *Amazon's Antitrust Paradox*, *supra* note 15, at 779.

25.     Amazon's anticompetitive conduct harms Sellers because it permits Amazon to charge "increased fees for compulsory fulfillment … services."[25] As one Seller reported in a letter sent to federal lawmakers in 2019, "Amazon raised logistics fees by 20% over the [previous] four years until they cost as much as *35% more* than competing services."[26]

26.     Amazon's violation of the antitrust laws also has injured and continues to injure Plaintiffs and Class Members, who pay higher prices when shopping on Amazon.com than they would but for Amazon's unlawful conduct. The higher prices inflicted on Plaintiffs and other consumers are a predictable and well-documented direct effect of Amazon's anticompetitive conduct—one that is known to Amazon and Sellers, but is hidden from Amazon's hundreds of millions of loyal customers.

27.     Amazon's anticompetitive conduct directly leads to higher prices for Amazon.com shoppers through several mechanisms.

28.     First, the algorithm that is the linchpin of Amazon's unlawful scheme gives the coveted Buy Box placement (the tying product) to products sold by Amazon and Sellers who use its Fulfillment services (the tied product), even when the identical product is offered for a lower total price and faster shipping by a Seller who controls its own handling and shipping—a practice that Amazon refers to as "Fulfillment by Merchant" or "FBM."

29.     Because "[m]ost Amazon shoppers end up clicking 'add to cart' for the offer highlighted in the buy box"—again, 90% of purchases on Amazon.com are made through the Buy Box—consumers pay more than they would have absent Amazon's anticompetitive scheme to leverage its power over e-commerce to conquer the logistics market.

---

[25] House Subcommittee Report, *supra* note 8, at 292.
[26] Spencer Soper, *Amazon Accused of Forcing Up Prices in Antitrust Complaint*, BLOOMBERG NEWS (Nov. 8, 2019) (emphasis added), https://www.bloomberg.com/news/articles/2019-11-08/amazon-merchant-lays-out-antitrust-case-in-letter-to-congress.

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 8 –

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

30.     Second, because an offer from a Seller who pays for Fulfillment by Amazon "wins" the Buy Box over an offer from a non-FBA Seller who offers the identical product for a lower price and with faster delivery, price competition among third-party Sellers on Amazon.com is greatly reduced. With the price competition among Sellers most likely to be featured in the Buy Box significantly diminished, items in the Buy Box are priced higher than they would be but for Amazon's anticompetitive scheme. And because 90% of purchases on Amazon.com are made through the Buy Box, consumers pay higher prices than they would have absent Amazon's market manipulation.

31.     Third, Amazon charges more for Fulfillment by Amazon than its competitors in the logistics industry do for comparable services,[27] and Sellers increase prices to meet their margins. As one Seller reported to federal lawmakers, using "Amazon's [Fulfillment] service forced him to boost prices by as much as 12% on more than 100 products he's been selling on Amazon for years."[28]

32.     Fourth, since many items on Amazon's website are sold by both Amazon and its Sellers, the higher prices charged by Sellers who use Amazon's Fulfillment services enable Amazon to price its products higher than it otherwise would have because its primary competitors—the Sellers on its platform—are charging higher prices as a result of Amazon's unlawful leveraging of its market power in e-commerce to take over the logistics market.

33.     Amazon is profiting handsomely from its unlawful tying scheme. Because a Seller's revenues are directly tied to their purchasing Fulfillment by Amazon (effectively a prerequisite for a Seller to appear in the Buy Box), Amazon can and does charge Sellers

---

[27] *See, e.g.*, Soper, *Amazon Accused of Forcing Up Prices*, *supra* note 26 ("The merchant's letter says Amazon raised logistics fees by 20% over the past four years until they cost as much as 35% more than competing services.").

[28] Soper, *Amazon Accused of Forcing Up Prices*, *supra* note 26.

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 9 –

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  supra-competitive prices for its Fulfillment services. And since Amazon's unlawful conduct

2  causes Sellers to increase prices, Amazon collects higher "referral fees"—in most cases, a

3  percentage of the total sales price[29]—from Sellers. In addition, the higher prices that Sellers

4  must charge to pay for Fulfillment services and meet their margins allow Amazon to charge

5  higher prices than it could but for its unlawful conduct.

6        34.     The economic harm that Amazon's scheme has inflicted on consumers is

7  difficult to overstate. Approximately $197 billion in products was sold *by Amazon alone*

8  through Amazon's website in 2020.[30] This does not include the products sold by Sellers,

9  who in 2020 accounted for 52% of products sold on Amazon.com.[31]

10        35.     Given that Amazon takes 30% of Sellers' revenues in the form of fees[32] and

11  that these fees garnered the company $80.46 billion dollars in U.S. sales in 2020,[33]

12  consumers purchase approximately $268 billion from third-party Sellers through

13  Amazon.com last year.[34] This brings the total that shoppers spent on Amazon.com in 2020

14  to approximately $465 billion—the $197 billion spent on products sold by Amazon plus the

15  $268 billion spent on products sold by Sellers.

16

17        [29] In most cases, the referral fees that Amazon collects from Sellers are a percentage of

18  the total sales price. *See Selling on Amazon Fee Schedule*, AMAZON (last visited Jan. 19, 2022),
https://sellercentral.amazon.com/gp/help/external/200336920.

19        [30] Amazon.com, Inc. Form 10-K for Fiscal Year Ending on December 31, 2020.

20        [31] Fareeha Ali, *What percentage of products on Amazon are sold by marketplace sellers?*,
DIGITAL COMMERCE 360 (Apr. 29, 2021), https://www.digitalcommerce360.com/2021/

21  04/29/what-percentage-of-products-on-amazon-are-sold-by-marketplace-sellers/.

22        [32] Stacy Mitchell, Ron Know & Zach Freed, *Amazon's Monopoly Tollbooth* 3, INSTITUTE
FOR LOCAL SELF-RELIANCE (July 2020), *available at* https://ilsr.org/wp-content/uploads/

23  2020/07/ILSR_Report_AmazonTollbooth_Final.pdf.

24        [33] Daniela Coppola, *Annual net revenue of Amazon from 2006 to 2020, by segment*, STATISTA
(July 7, 2021), https://www.statista.com/statistics/266289/net-revenue-of-amazon-by-region/.

25        [34] $80.46 billion ÷ 0.30 = $268.2 billion.

CONSOLIDATED AMENDED      – 10 –      **TERRELL MARSHALL LAW GROUP PLLC**
CLASS ACTION COMPLAINT      936 North 34th Street, Suite 300
Case No. 2:21-cv-693-RSM      Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1          36.      Amazon has forced the vast majority of Sellers to purchase its Fulfillment

2    services. As a result, 73% of all Sellers now use Fulfillment by Amazon.[35] The Buy Box,

3    through which 90% of purchases on Amazon.com are made, presents consumers with offers

4    from Amazon or FBA Sellers.

5          37.      The Seller who complained to federal lawmakers reported as much as a 12%

6    increase in his prices as a result of Amazon's unlawful conduct. Assuming that, but for

7    Amazon's anticompetitive conduct, the prices of items purchased through the Buy Box were

8    on average higher by even a tenth of what this Seller reported (i.e., 1.2% higher)—a

9    conservative estimate given that Amazon takes 30% Seller revenues in fees—**Amazon's**

10   **violations of the antitrust laws overcharged consumers by approximately $5 billion in**

11   **2020 alone**, and billions of dollars more over the preceding years.

12         38.      Amazon's leveraging of its market power in e-commerce to attain dominance

13   in the logistics market violates both Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2).

14         39.      Amazon's tying arrangement is a *per se* violation of Section 1 of the Sherman

15   Act because Amazon has significant—indeed, monopoly-level—power over the Prime

16   Badge, the Buy Box, and e-commerce generally, and Amazon uses that power to force

17   Sellers into purchasing Amazon's Fulfillment services.

18         40.      Amazon's conduct also violates Section 2 of the Sherman Act because

19   (i) Amazon has monopoly-level power in several markets—the U.S. online retail-goods

20   market and the market for favorable Seller placement on the Amazon website (i.e., the

21   granting of the Prime badge, which garners higher placement in search results and access to

22   the Buy Box)—and (ii) Amazon has used that monopoly-level power to foreclose

23

24         [35] House Subcommittee Report, *supra* note 8, at 288, 290 (stating that 73% of all Sellers
25   use Amazon's Fulfillment services, even though many Sellers would prefer to use other
     logistics companies to warehouse, package, and ship their products).

CONSOLIDATED AMENDED                    – 11 –         **TERRELL MARSHALL LAW GROUP PLLC**
CLASS ACTION COMPLAINT                                936 North 34th Street, Suite 300
Case No. 2:21-cv-693-RSM                              Seattle, Washington 98103-8869
                                                      TEL. 206.816.6603 • FAX 206.319.5450
                                                      www.terrellmarshall.com

1    competition, to gain advantage, and to destroy competitors in the market for the

2    warehousing, packing, and shipping of retail goods to consumers.

3         41.    In sum, Amazon's unlawful use of its monopoly-level power has given it an

4    edge in the logistics market, forced Sellers to pay supra-competitive prices for Fulfillment

5    services, and increased prices for Plaintiffs and other consumers who shop on Amazon.com.

6    Amazon's unlawful tying scheme harms hundreds of thousands of businesses and hundreds

7    of millions of consumers. The only winner is Amazon, which earns billions as a result of its

8    anticompetitive conduct while continuing to gain economic power in all markets it enters.

9                                  **II.    PARTIES**

10        42.    Plaintiff Angela Hogan is a natural person and a citizen of the State of

11   Illinois. Ms. Hogan has had an Amazon Prime membership for the majority of the past

12   seven years. During that time, she has made numerous purchases through Amazon.com.

13   Ms. Hogan made her purchases almost exclusively through the Buy Box. She purchased

14   items from Amazon and third-party Sellers, and the items she purchased from the Buy Box

15   were generally shipped by Amazon's Fulfillment services. In the past year alone, Ms. Hogan

16   has made dozens of purchases through Amazon.com, including but not limited to,

17   purchases of skin care products, shampoo, consumer electronics, clothing, children's toys,

18   child-proof cabinet locks, stroller accessories, bedding, kitchen supplies, eating utensils,

19   drinkware, skateboarding equipment, and jewelry. Ms. Hogan was injured by Amazon

20   because, as a direct result of Amazon's anticompetitive actions, she was overcharged for the

21   numerous items she purchased through the Buy Box.

22        43.    Plaintiff Andrea Seberson is a natural person and a citizen of the State of

23   Minnesota. Ms. Seberson has had an Amazon Prime membership for a number of years.

24   During that time, she made numerous purchases through Amazon.com. Ms. Seberson made

25

CONSOLIDATED AMENDED                    – 12 –          TERRELL MARSHALL LAW GROUP PLLC
CLASS ACTION COMPLAINT                                  936 North 34th Street, Suite 300
Case No. 2:21-cv-693-RSM                                Seattle, Washington 98103-8869
                                                        TEL. 206.816.6603 • FAX 206.319.5450
                                                        www.terrellmarshall.com

1   her purchases almost exclusively through the Buy Box. She purchased items from Amazon

2   and third-party Sellers, and the items she purchased from the Buy Box were generally

3   shipped by Amazon's Fulfillment services. In the past year alone, Ms. Seberson has made

4   dozens of purchases through Amazon.com, including, but not limited to, purchases of

5   books, movies, electronics, clothing, household goods, pet care supplies, personal care

6   supplies, bedding, home décor, paddle boards, camping equipment, bathroom plumbing

7   parts, tools, lighting, food, small appliances, cooking utensils, and garden supplies.

8   Ms. Seberson was injured by Amazon because, as a direct result of Amazon's

9   anticompetitive actions, she was overcharged for the numerous items she purchased through

10   the Buy Box.

11       44.     Defendant Amazon.com, Inc. is a Delaware corporation with a principal

12   place of business at 410 Terry Avenue North, Seattle, Washington 98109-5210. At all

13   relevant times, Amazon advertised, marketed, promoted, offered for sale, and sold goods

14   throughout the United States, including in this District.

## III.    JURISDICTION AND VENUE

16       45.     This action arises under Sections 1 and 2 of the Sherman Act (15 U.S.C.

17   §§ 1, 2), Section 4 of the Clayton Act (15 U.S.C. § 15(a)), and Section 16 of the Clayton Act

18   (15 U.S.C. § 26). Plaintiffs seek damages for their injuries, as well as for injuries suffered by

19   Class Members, resulting from Amazon's anticompetitive conduct. Plaintiffs also seek an

20   injunction to prohibit Amazon from continuing its unlawful conduct. This Court has subject

21   matter jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332 (diversity),

22   28 U.S.C. § 1337(a) (antitrust), and 15 U.S.C. § 15 (antitrust).

23       46.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because

24   Defendant Amazon maintains its corporate headquarters and principal place of business in

25

1  this District, transacts business within this District, and carries out interstate trade and

2  commerce in this district. Venue also is appropriate in this District under Section 12 of the

3  Clayton Act, 15 U.S.C. § 22 (nationwide venue for antitrust matters).

# IV.   FACTUAL ALLEGATIONS

5  **A.   Unchecked Growth: It's Always Day 1 at Amazon[36]**

6  **1.   Amazon's Prime Strategy of Losing Money to Make Money**

7  47.   Amazon is a behemoth in numerous markets: e-commerce, consumer

8  electronics, television and film production, groceries, cloud services, book publishing, and

9  logistics.[37] In 2020 alone, Amazon's revenues were more than $386 billion, from which

10  Amazon reaped a profit of $21.3 billion.[38]

11  48.   As of late 2020, Amazon had a 50% or higher share of U.S. retail

12  e-commerce.[39] Over the past 5 years, Amazon's share of U.S. retail e-commerce has grown

13  an average of 8% per year.[40] If Amazon keeps gaining market share at this rate for the next

---

[36] In his first letter to shareholders in 1997, Jeff Bezos wrote, "this is Day 1 for the Internet and, if we execute well, for Amazon.com." Jeff Bezos, *Amazon's original 1997 letter to shareholders* (last visited Jan. 19, 2022), https://www.aboutamazon.com/news/company-news/amazons-original-1997-letter-to-shareholders. "Day 1" means "energy and dynamism"—"mak[ing] high-quality, *high-velocity* decisions." Jeff Bezos, *2016 Letter to Shareholders* (last visited Jan. 19, 2022), https://www.aboutamazon.com/news/company-news/2016-letter-to-shareholders. In contrast, "Day 2 is stasis. Followed by irrelevance. Followed by excruciating, painful decline. Followed by death. And that is why it is always Day 1." *Id.* (internal quotation marks omitted).

[37] House Subcommittee Report, *supra* note 8, at 247.

[38] *Amazon Company Profile*, FORTUNE 500 (last visited Jan. 19, 2022), https://fortune.com/company/amazon-com/fortune500/.

[39] House Subcommittee Report, *supra* note 8, at 254.

[40] Stephanie Chevalier, *Projected retail e-commerce GMV share of Amazon in the United States from 2016 to 2021*, STATISTA (July 7, 2021), https://www.statista.com/statistics/788109/amazon-retail-market-share-usa/.

CONSOLIDATED AMENDED                    – 14 –          **TERRELL MARSHALL LAW GROUP PLLC**
CLASS ACTION COMPLAINT                                 936 North 34th Street, Suite 300
Case No. 2:21-cv-693-RSM                               Seattle, Washington 98103-8869
                                                       TEL. 206.816.6603 • FAX 206.319.5450
                                                       www.terrellmarshall.com

5 years—and there is no indication that Amazon's rapacious growth is slowing down—**the company will control 73.5% of the U.S. retail e-commerce market by 2026**.

49.     How is this possible, given that during Amazon's first 20 years in business, Amazon "generated a positive net income in just over half of its financial reporting quarters," and even in the profitable quarters, "its margins were razor-thin"?[41]

50.     As Lisa Khan, now the Chair of the FTC, wrote in her seminal article *Amazon's Antitrust Paradox*, Amazon established its "dominance as an online platform thanks to two elements of its business strategy: [i] a willingness to sustain losses and invest aggressively at the expense of profits, and [ii] integration across multiple business lines."[42]

51.     By 1997, it was clear from Bezos's own statements that "the premise of Amazon's business model was to establish scale," and "[t]o achieve scale, the company prioritized growth":[43]

> **[Interviewer]:** In your prospectus you say, "The Company's view … is that it will incur substantial losses for the foreseeable future."
>
> **Bezos:** We're not just covering ourselves. We're disclosing the facts of the situation. We're going to be unprofitable for a long time. And that's our strategy.
>
> **[Interviewer]:** Presumably, at some point you probably don't want to be showing a loss.
>
> **Bezos:** Long term, the only way companies generate value is by making profits.

---

[41] Khan, *Amazon's Antitrust Paradox*, *supra* note 15, at 747.
[42] Khan, *Amazon's Antitrust Paradox*, *supra* note 15, at 746–47.
[43] Khan, *Amazon's Antitrust Paradox*, *supra* note 15, at 749.

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 15 –

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    [Interviewer]: Are there things that need to happen for you to reach

2    that point?

3    **Bezos:** Only one. ***The key thing is sales growth.***

4    **[Interviewer]:** *But your sales must grow faster than what you spend to*

5    *get them, right?*

6    **Bezos:** *No, it's not the rate of growth. It's achieving a certain scale.*[44]

7    52.    As Bezos's statements show, "aggressive investing would be key [to

8    Amazon's success], even if that involved slashing prices or spending billions on expanding

9    capacity, in order to become consumers' one-stop-shop."[45]

10   53.    Enter Amazon Prime. While the initial benefit of Prime membership was

11   unlimited two-day shipping, since the program's inception in 2006, Amazon has bundled in

12   numerous other benefits, such as special deals and discounts, 2-hour grocery delivery

13   through Whole Foods Market and Amazon Fresh, unlimited streaming of movies and TV

14   shows through Prime Video, access to over two million songs through Prime Music,

15   unlimited photo storage through Amazon Photos, and free two-day delivery and discounts

16   when filling a medication prescription through Amazon Pharmacy.[46]

17   54.    Amazon did not make money from its Prime program, but the company was

18   "willing to lose hundreds of millions of dollars a year on" Prime "because the service

19   create[d] loyalty to the company."[47] As an Amazon employee who worked on Prime

20

21   [44] Jeffrey L. Seglin, *Hot strategy: 'Be unprofitable for a long time,'* ABI/INFORM (Sept. 1, 1997) (accessed via LEXISNEXIS) (emphasis added).

22   [45] Khan, *Amazon's Antitrust Paradox*, *supra* note 15, at 749.

23   [46] Zoe Malin, *What is Amazon Prime? Membership benefits, prices and more*, NBC NEWS (June 22, 2021), https://www.nbcnews.com/shopping/amazon-prime-day/amazon-prime-benefits-cost-n1269672.

24   [47] Steve Woo, *Amazon 'Primes' Pump for Loyalty*, WALL STREET JOURNAL (Nov. 14,

25   2011), https://www.wsj.com/articles/SB10001424052970203503204577036102353359784.

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM                        – 16 –                        TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   explained: "It was never about the $79. It was really about changing people's mentality *so*

2   *they wouldn't shop anywhere else*."[48]

3          55.    Amazon's strategy of operating the Prime program at a loss paid off,

4   generating extraordinary customer loyalty. One 2020 survey of American consumers found

5   that, despite 24% of respondents "hav[ing] negative feelings about Amazon's impact on the

6   retail industry," 47% of Americans nonetheless "do at least a quarter of their shopping on

7   Amazon," and 23% of respondents "buy more than half of all their goods on the site."[49]

8   Moreover, the survey showed that "[f]ast and free shipping [i.e., Prime shipping] is far and

9   away the top reason people shop at Amazon, selected by 80% of respondents."[50]

10          56.    Loyalty to Amazon is especially strong among Prime members, who account

11   for the vast majority of sales on Amazon.com.[51] As the House Subcommittee Report found,

12   Prime members are so loyal that they are not sensitive to price increases:

13                 Once Prime members pay the upfront annual membership fee, they

14                 are likely to concentrate their online purchases with Amazon … . As

15                 one market participant observed, "Prime members will continue to

16                 use Amazon and not switch to competing platforms, *despite higher*

17

18          [48] Khan, *Amazon's Antitrust Paradox*, *supra* note 15, at 752–53 (citation omitted).

19          [49] *New Consumer Survey from Convey Reveals Mixed Feelings About Amazon – Even As Fast, Free Shipping Proves Irresistible*, BUSINESS WIRE (Feb. 5, 2020) (emphasis added)

20   https://www.businesswire.com/news/home/20200205005457/en/New-Consumer-Survey-from-Convey-Reveals-Mixed-Feelings-About-Amazon-%E2%80%93-Even-As-Fast-

21   Free-Shipping-Proves-Irresistible.

        [50] *Id.*

22          [51] Most people who purchase items through Amazon are Amazon Prime members,

23   *see* Tugba Sabanoglu, *Number of Amazon Prime users in the United States from 2017 to 2022*, STATISTA (Dec. 1, 2020) (showing that there were 142.5 million Prime members in United

24   States in 2020), and Prime members also account for the vast majority of sales through Amazon, "spend[ing] an average of $1,400 annually on Amazon, versus $600 [spent

25   annually by] non-members." House Subcommittee Report, *supra* note 8, at 260.

*prices and lower-quality items on Amazon* compared to other
marketplaces, *and despite recent increases in the price of a Prime
membership*."[52]

57.    This is in large part because Amazon creates the impression that itis giving
consumers not only the best shipping but also the best price:

> Amazon loyalists shop on Amazon.com trusting that they are getting
> a bargain. . . . [I]t's this perception of low pricing that helps make
> shopping on Amazon almost instinctual to many consumers. It's this
> perception that keeps Amazon shoppers from checking other sites for
> lower pricing before hitting the "Place Your Order" button. It makes
> retail shoppers check their Amazon app before heading to the register.
> It's enough to convince folks to make purchases with just an Alexa
> voice command or a Dash button-push without concern for how little
> visibility they have into actual market pricing.[53]

**2.    The Buy Box Trains Consumers to Click Without Thinking**

58.    Consumers' trust in Amazon extends to the Buy Box.

59.    Amazon's e-commerce platform allows multiple Sellers to offer the same
product; in some cases Amazon offers the product as well. [54] The Buy Box enables one-stop
single-click shopping, eliminating the need for consumers to comparison shop.

60.    When a consumer clicks on a link to a product on Amazon's site, the
consumer is taken to the product page, and an algorithm controlled by Amazon "chooses a

---

[52] House Subcommittee Report, *supra* note 8, at 260 (emphasis added);
[53] Jake Fishman, *Amazon, the Price Perception Leader*, GAP INTELLIGENCE (Sept. 7, 2017),
https://www.gapintelligence.com/blog/amazon-com-the-price-perception-leader/.
[54] House Subcommittee Report, *supra* note 8, at 249.

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 18 –

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   single seller from all the vendors offering that product to display as the featured offer in the

2   'Buy Box'":[55]



61.   Amazon Marketplace—the market through which third party Sellers offer

their goods—"is so well integrated into Amazon.com [that] a lot of customers don't even

realize they are [sometimes] purchasing from third party sellers" when they make a

purchase through the Buy Box.[56]

---

[55] House Subcommittee Report, *supra* note 8, at 249.

[56] Sophia Spiridakis, *What Is Amazon Marketplace? Everything You Need to Know About the Platform*, SELLER'S CHOICE (Mar. 20, 2020), https://www.sellerschoice.digital/blog/what-amazon-marketplace; *see also* Dave Hamrick, *How to Win the Amazon Buy Box*, JUNGLE SCOUT (Jan. 4, 2021) ("Ultimately, the Buy Box facilitates a low-friction sale on Amazon by enabling shoppers to make their purchase quickly and easily, within just two or three steps. But, what most consumers don't realize is that the Buy Box is separate from the listing itself and sellers compete for ownership of the widget."), https://www.junglescout.com/blog/how-to-win-the-buy-box/.

CONSOLIDATED AMENDED           – 19 –
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

62.     Because 90% of consumer purchases on Amazon's website are made through the Buy Box,[57] being featured in the Buy Box is extremely important to Sellers:[58]

> Amazon generates over $250 billion in sales every year. Of those conversions, over 90% occur using Amazon's buy box.
>
> If you want to increase your Amazon sales, winning the buy box on the product detail page is pivotal. Retailers featured on Amazon's buy box sell more products. We all know this.

63.     Another analyst provides a succinct yet comprehensive statement of the value of the Buy Box to Sellers:[59]

> ## Why is the Buy Box important for Amazon sellers?
>
> There are two main reasons why you should be concerned about the Buy Box.
>
> 1. Owning the Buy Box increases your chances of making a sale.
>
> Nearly all Amazon purchases are made through the Buy Box, as it is the first 'call to action' shoppers see.
>
> However, even though the Buy Box gives information on who is selling and fulfilling the product, it's unlikely that these factor into a customer's decision to buy.
>
> The convenience of the Buy Box's placement is often enough to generate a sale.
>
> 2. If you own the Buy Box, you can create Amazon PPC ads.
>
> Amazon PPC (pay-per-click) allows sellers to bid on prices of clicks for certain keywords, and sellers who control the Buy Box can create sponsored listings for the product through Amazon PPC.
>
> But, if you do *not* own the Buy Box — even if it is on your own listing — you can't create ads for the product.

---

[57] Ziebak, *How to Win the Amazon Buy Box in 2021*, *supra* note 14.
[58] Ziebak, *How to Win the Amazon Buy Box in 2021*, *supra* note 14.
[59] Dave Hamrick, *How to Win the Amazon Buy Box*, *supra* note 56.

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 20 –

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

64.     The importance of "winning the Buy Box" to a Seller's bottom line cannot be overstated. The advantage to a Seller of their product appearing in the Buy Box is so well known that books have been written on the topic:



65.     Thousands if not millions of blog posts and articles analyze the Buy Box or give Sellers tips on how to win it. A Google search for "how to win the buy box Amazon" yields nearly 200 million results:



CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 21 –

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

66.   So how does Amazon's algorithm determine which Seller wins the Buy Box?

67.   Amazon represents that, to win the Buy Box, a Seller must (i) "have a Professional selling account"[60] (ii) "[p]rice [its] items competitively," (iii) "[o]ffer faster shipping and free shipping," (iv) "[p]rovide great customer service," and (v) "[k]eep stock available."[61]

68.   Conspicuously missing from Amazon's list is the most important factor for winning the Buy Box: a Seller's paying Amazon for its Fulfillment services.

**B.     Fulfillment by Amazon: How to Win Markets and Influence Sellers**

69.   As stated in the Introduction, from its inception Amazon's aspirations were never constrained to being the largest online book retailer or even the largest retailer. From the beginning, Amazon's goal was to dominate numerous sectors of the U.S. economy.

70.   Amazon's modus operandi for achieving this goal is illustrated by its strategy for building a logistics empire:

(i)     Invest heavily in online retail, operating at a loss to quickly achieve scale.

(ii)    Undercut competitors' prices and offer free shipping through Prime to engender customer loyalty and make Amazon the consumer's one-stop-shop.

(iii)   Once scale and customer loyalty are attained, "leverage[ ] its dominance over online shopping and its captive audience of

---

[60] *Featured Offer eligibility*, AMAZON SELLER CENTRAL (last visited Jan. 19, 2022), https://sellercentral.amazon.com/gp/help/external/200418100?language=en-US&ref=efph_200418100_cont_201687550.

[61] *Becoming the Featured Offer*, AMAZON SELLER CENTRAL (last visited Jan. 19, 2022), https://sellercentral.amazon.com/gp/help/external/help.html?itemID=201687550&language=en-US&ref=efph_201687550_cont_37911.

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 22 –

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    sellers to rapidly become a huge player in package delivery"

2    and "finance[ing] the necessary infrastructure on the backs of

3    sellers."[62]

4    71.    Amazon's business strategy echoes Archimedes' statement that, given the

5    right lever and "a firm place to stand," he could "move the earth."[63]

6    72.    The first two steps of Amazon's strategy had been implemented by 2006,

7    when Amazon launched Fulfillment by Amazon, its logistics business which provides

8    warehousing, packing, and shipping services.

9    73.    Amazon touted its Fulfillment services as a boon for both consumers and

10    "small and medium-sized" Sellers:

11    "We created Fulfillment by Amazon because it is good for

12    Amazon.com customers, and therefore, great for our third-party

13    sellers," said Joe Walowski, Product Manager, Fulfillment by

14    Amazon. "With membership in Amazon Prime growing every day,

15    more and more Amazon.com customers want a great deal on

16    shipping and to receive their orders quickly. Fulfillment by Amazon

17    makes it possible for sellers to offer Amazon.com customers this

18    convenience."[64]

19    74.    In the early days of Fulfillment by Amazon, there were indications that some

20    Sellers felt that they were benefiting from Amazon's Fulfillment services.[65]

---

[62] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 8.

[63] ENCARTA BOOK OF QUOTATIONS 31 (2000).

[64] *Amazon Launches New Services to Help Small and Medium-Sized Businesses Enhance Their Customer Offerings by Accessing Amazon's Order Fulfillment, Customer Service, and Website Functionality*, BUSINESS WIRE (Sept. 19, 2006) (accessed via LEXISNEXIS).

[65] *See generally* Brad Stone, *Sold on eBay, Shipped by Amazon.com*, THE NEW YORK TIMES, at C-1 (Apr. 27, 2007) (accessed via LEXISNEXIS) ("The program has some enthusiastic

CONSOLIDATED AMENDED                    – 23 –
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

75.     But Sellers' excitement about Amazon's Fulfillment services was short-lived as it became clear that Amazon planned to build its logistics empire on the backs of Sellers in two ways.

76.     First, Amazon conditioned Sellers' ability to obtain a Prime Badge—and with it, the coveted Buy Box placement—on a Sellers' purchasing Amazon's Fulfillment services.

77.     Second, once Sellers were completely reliant on Amazon for logistics, Amazon continually increased the fees that Sellers paid for Fulfillment services in order to fund its expansion in the logistics market.

**1.     Amazon ties Sellers' access to the Buy Box on their paying Amazon for its Fulfillment services.**

78.     Amazon's tying scheme—expanding its logistics business by forcing Sellers to pay for Fulfillment by Amazon as a condition of gaining access to the Buy Box—has long been known to industry insiders and analysts, but consumers have for the most part remained in the dark.

79.     The tie between a Seller's offer being listed in the Buy Box (which requires that the Seller have a Prime Badge) and Fulfillment by Amazon also is well known to lawmakers. As the House Subcommittee Report puts it:

> There is a strong link between Amazon Marketplace and Fulfillment by Amazon (FBA), Amazon's paid logistics service. Amazon uses its dominance in each of these markets to strengthen and reinforce its position in the other.

early customers. Barry Mark, who runs Treebeard Books from his home in Palm Beach County, Fla., buys surplus books and sells them on Amazon and other sites. Since he signed up for Fulfillment by Amazon last September, he says that his sales have jumped more than 30 percent, and a third of the orders that come in are from members of Amazon Prime, the company's premium discount shipping program.").

CONSOLIDATED AMENDED                          – 24 –
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    Amazon's FBA program combines warehousing, packing, and

2    shipping services, and most importantly, access to Prime customers.

3    …

4    FBA is functionally the ***only*** way for sellers to get the Prime Badge for

5    their product listings.[66]

6    80.    Numerous articles and blog posts (some by Sellers themselves) provide

7    support for the House Subcommittee Report's conclusion that Amazon exercises its market

8    power in e-commerce to force Sellers to pay for its Fulfillment services:

9    (i)    "The variable that has the greatest impact on the Buy Box is the

10   product's fulfillment method. Since Amazon considers its

11   fulfillment service to have perfect metrics across variables, using

12   Fulfillment By Amazon (FBA) is the easiest way to increase your

13   chances of winning the Buy Box."[67]

14   (ii)   "Amazon favours FBA sellers, by making it easier to win the buy

15   box if you use their distribution network."[68]

16   (iii)  "The simplest way to sell on Amazon Prime is to join Amazon

17   FBA, a highly automated and powerful fulfillment network. You

18   send your product inventory to Amazon, and they store it in their

19   warehouses. When a customer places an order through your listing,

20   Amazon picks it, packs it, and ships it. Once your products are in

21

22   ─────────────────

23   [66] House Subcommittee Report, *supra* note 8, at 287 (emphasis added).
     [67] Lanxner, *The Amazon Buy Box*, *supra* note 22.
24   [68] *Hacking the Buy Box – Understanding Amazon's Buy Box Eligibility & Algorithm*,
     MUSEMINDED (Dec. 3, 2019), https://museminded.com/how-to-win-the-amazon-buy-
25   box/.

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 25 –

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    FBA, they automatically get the Prime Badge."[69]

2    (iv) "When you're FBM [fulfilled by merchant], you're not eligible for

3    the Amazon Prime Badge, which is tied directly to Amazon's

4    organic ranking algorithm."[70]

5    (v) "The easiest way to sell Amazon Prime is to use FBA as your

6    fulfillment method. Regardless of your business model, by joining

7    Amazon as an FBA seller your products will automatically be

8    considered for Amazon Prime. … From a ready-to-buy customer

9    base to an increased chance of winning the Buy Box, there are many

10    benefits to selling Amazon Prime."[71]

11    81.    The 2020 House Subcommittee Report presents further compelling evidence

12 that Sellers were coerced by Amazon into purchasing Fulfillment services to gain access to

13 the Buy Box, even when the Sellers found Amazon's Fulfillment services to be of *lower*

14 *quality* than the warehousing, packing, and shipping services offered by competitors:

15    (i) "One third-party seller provided the Subcommittee with anecdotal

16    evidence that Amazon favors sellers who participate in Amazon's

17    fulfillment program over sellers who do not. The seller set up an

18    experiment where he sold the same product, one self-fulfilled and

19    the other fulfilled through FBA, and ran different test cases. The

20    seller found that 'Even when the consumer price of the self-fulfilled

21

22    [69] Michael Burns, *How to Sell on Amazon Prime: 3 Ways to Get the Prime Badge*,
WEBRETAILER (Apr. 29, 2020) (emphasis added), https://www.webretailer.com/b/how-to-
sell-on-amazon-prime/.

23    [70] Nick Cotter, *Amazon FBM and Seller Fulfilled Prime (SFP): How-to Guide*, TINUITI
(June 16, 2020), https://tinuiti.com/blog/amazon/amazon-fbm/.

24    [71] Regan McPhee, *How to sell on Amazon Prime in 2021*, JUNGLESCOUT (May 27, 2020),
https://www.junglescout.com/blog/how-to-sell-on-amazon-prime/.

25

CONSOLIDATED AMENDED                    – 26 –          TERRELL MARSHALL LAW GROUP PLLC
CLASS ACTION COMPLAINT                                 936 North 34th Street, Suite 300
Case No. 2:21-cv-693-RSM                               Seattle, Washington 98103-8869
                                                       TEL. 206.816.6603 • FAX 206.319.5450
                                                       www.terrellmarshall.com

1    order was reduced and sold for a lower price (7% lower) than the

2    FBA offer, the FBA still "won" the "Buy Box."' The seller indicated

3    that, without this favorable treatment for FBA, they would not

4    choose to use FBA, as they found **Amazon's fulfillment service**

5    **was often slower and less reliable than self-fulfillment**."[72]

6    (ii)    "One third-party seller told Subcommittee staff, 'We use both FBA

7        and self-fulfillment, **all of our negative comments are on items**

8        **shipped through FBA**.'"[73]

9    (iii)    "A competing online marketplace described how Amazon

10        effectively forcing sellers into its FBA program makes it more

11        difficult to compete with Amazon for sellers … . It … explained that

12        because of Amazon's dominance in online commerce, 'Even sellers

13        who sell on other marketplaces are pushed into FBA, because it is

14        the only practicable way to obtain sales on the Amazon

15        marketplace.'"[74]

16    82.    During his July 2020 testimony before the House Subcommittee, Amazon's

17    CEO Jeff Bezos all but admitted that placement in the Buy Box is tied to a Sellers' purchase

18    of Amazon's Fulfillment services:

19        Rep. Scanlon: "Okay, so we've got fulfillment by Amazon. And a

20        year ago, we asked whether a merchant who was enrolled in

21        Fulfillment By Amazon, also known as FBA, is a factor in whether

22        they can be awarded the Buy Box. And at that time, Amazon said no.

23    _____

24    [72] House Subcommittee Report, *supra* note 8, at 289–90.

25    [73] House Subcommittee Report, *supra* note 8, at 290.
     [74] House Subcommittee Report, *supra* note 8, at 290.

1              But the evidence is indicating, and your own documents are showing,

2       that being enrolled in that program is a major factor, and **it**

3       **effectively forces sellers to pay for fulfillment services from**

4       **Amazon if they want to make sales**. Mr. Bezos, has Amazon's Buy

5       Box algorithm ever favored third party sellers who buy fulfillment

6       services from Amazon over other sellers?"

7              Jeff Bezos: **"**I think effectively the Buy Box, directly or indirectly, I'm

8       not sure if it's direct, but indirectly, **I think the Buy Box does favor**

9       **products that can be shipped with Prime**."[75]

10      83.      Indeed, before its unlawful practices came under scrutiny, Amazon openly

11   touted the fact that purchasing Fulfillment services from Amazon gave Sellers an advantage.

12   From February 2013 through December 2015, Amazon proudly proclaimed on its website:

13   "Because most FBA listings are ranked without a shipping cost, you get an edge when

14   competing!"[76]

15      84.      Amazon's anticompetitive tying scheme to force Sellers to pay for its

16   Fulfillment services has been wildly successful: approximately 85% of the top 10,000

17   Amazon Sellers—and 73% of Sellers worldwide—use FBA.[77]

18

19

20

21

22          [75] *Big Tech Antitrust Hearing Full Transcript July 29*, REV (July 29, 2020) (emphasis added),
     https://www.rev.com/blog/transcripts/big-tech-antitrust-hearing-full-transcript-july-29.

23          [76] Julia Angwin & Surya Mattu, *Amazon Says It Puts Customers First. But Its Pricing
     Algorithm Doesn't*, PROPUBLICA (Sept. 20, 2016) (emphasis added),
     https://www.propublica.org/article/amazon-says-it-puts-customers-first-but-its-pricing-

24   algorithm-doesnt.

25          [77] House Subcommittee Report, *supra* note 8, at 288, 290.

CONSOLIDATED AMENDED                  – 28 –          **TERRELL MARSHALL LAW GROUP PLLC**
CLASS ACTION COMPLAINT                               936 North 34th Street, Suite 300
Case No. 2:21-cv-693-RSM                             Seattle, Washington 98103-8869
                                                     TEL. 206.816.6603 • FAX 206.319.5450
                                                     www.terrellmarshall.com

1

2        **2.     Amazon's Seller Fulfilled Prime program illustrates the company's
         anticompetitive double standard.**

3        85.     In 2015, Amazon did introduce an ostensible way for Sellers to gain access to

4  the Buy Box *without* paying for Fulfillment by Amazon. The company called the program

5  "Seller Fulfilled Prime," but the program turned out to be no more than a fig leaf that failed

6  to conceal Amazon's scheme from Sellers and regulators.

7        86.     Nominally, Seller Fulfilled Prime gave Sellers a chance to obtain a Prime

8  Badge and access to the Buy Box *without* paying for Fulfillment by Amazon.[78]

9        87.     Practically, however, "only a very small percentage of sellers could meet the

10 onerous eligibility requirements for Seller Fulfilled Prime."[79] Those eligibility requirements

11 include, among other things (i) that "99% of orders must be shipped on time and less than

12 0.5% cancelled,"[80] and (ii) "an on-time delivery rate of 98.5 percent."[81]

13       88.     These requirements are so stringent that *Amazon itself was incapable of*

14 *achieving them*. The share of packages purchased directly from Amazon that were not

15 delivered on time went from 4.6% in 2017 to 8.6% in 2018 to an astounding **16.6% in**

16 **2019**.[82]

17       89.     Thus, it was evident from its inception that Seller Fulfilled Prime was an

18 anticompetitive sham. In addition to Amazon being unable to meet the criteria it established

19 for Sellers, Amazon threatened to revoke the Prime status of some Sellers who used Seller

20       [78] Andrew Foot, *FBA vs FBM: Should You Opt for Amazon Fulfillment Services or Use Your
21 Own Resources?*, NEWSTEX BLOG (Nov. 1, 2019) (accessed via LEXISNEXIS).
         [79] House Subcommittee Report, *supra* note 8, at 287.
22       [80] Foot, *FBA vs FBM*, *supra* note 78.
         [81] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 8.
23       [82] Rachel Premack, *Amazon is moving away from the USPS and UPS for its in-house delivery
24 network — but the 'sloppier' system may be delaying your packages (AMZN, UPS)*, BUSINESS
   INSIDER (July 3, 2019), https://markets.businessinsider.com/news/stocks/amazon-late-
25 packages-compared-to-fedex-ups-usps-shipping-2019-7.

CONSOLIDATED AMENDED                  – 29 –        **TERRELL MARSHALL LAW GROUP PLLC**
CLASS ACTION COMPLAINT                             936 North 34th Street, Suite 300
Case No. 2:21-cv-693-RSM                           Seattle, Washington 98103-8869
                                                   TEL. 206.816.6603 • FAX 206.319.5450
                                                   www.terrellmarshall.com

1    Fulfilled Prime "unless they switched from buying postage from the U.S. Postal Service to

2    buying it from Amazon, often at higher rates."[83]

3       90.    In February 2019, "Amazon stopped allowing new sellers to sign up" for

4    Seller Fulfilled Prime.[84]

5       **3.**     **Amazon taxes Sellers to fund the rapid expansion of its logistics business.**

6       91.    Because Sellers' access to the Buy Box is conditioned on their purchasing

7    Amazon's Fulfillment services, Amazon is able to charge Sellers supra-competitive fees for

8    Fulfillment by Amazon. These fees operate as a tax that Amazon uses to fund its foray into

9    the logistics industry and to cover losses in its other parts of its business.

10       92.    As one logistics consultant explained, the only reason for a Seller to pay for

11    Amazon's Fulfillment services is because they are being coerced to do so:

12            On a dollars and cents side, [Fulfillment by Amazon is] not that

13            competitive. … I'd recommend Amazon if they were really good on

14            price, but they're not. If it weren't for the algorithm, if it weren't for

15            the fifty-plus pressure points that Amazon is placing on the business,

16            FBA wouldn't be attractive.[85]

17       93.    Amazon's power in the e-commerce market has allowed it to sharply raise the

18    fees for its Fulfillment services over time. The company's revenues from its logistics business

19    grew from approximately $3 billion in 2014 to $29 billion in 2019.[86]

20

21

22

23         [83] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 8.

24         [84] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 8.
         [85] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 8.

25         [86] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 8.

CONSOLIDATED AMENDED       – 30 –       **TERRELL MARSHALL LAW GROUP PLLC**
CLASS ACTION COMPLAINT                  936 North 34th Street, Suite 300
Case No. 2:21-cv-693-RSM                Seattle, Washington 98103-8869
                                      TEL. 206.816.6603 • FAX 206.319.5450
                                         www.terrellmarshall.com

94.     The increase in revenue from Amazon's Fulfillment services is primarily driven by the steep increase in the fees charged by the company, not an increase in the number of Sellers who pay for Fulfillment by Amazon:

> Between 2013 and 2019, the standard rate for storing inventory in Amazon's warehouses during off-peak months rose **67 percent**. For the peak months of October through December, the rate soared by **300 percent**. Storage rates for standard-sized items (those under 20 pounds and within certain dimensions) are now 75 cents per cubic foot per month during the first part of the year and $2.40 during the peak season. **Amazon's storage fees are much higher than those of its competitors**, according to several sources. …
>
> The prices Amazon charges to pack and ship an item have likewise risen. … Prices across the board went up [between 2013 and 2020]. The size of the increase varied widely, but the median increase for an item was 55 percent.[87]

95.     For a wide variety of products, the shipping fees Amazon charges Sellers who use its Fulfillment services increased by more than 100% from 2013 to 2020, and the storage fees increased by **200%** or more during the same period:[88]

---

[87] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 8; *see also* Stacy Mitchell, *Amazon Doesn't Just Want to Dominate the Market – It Wants to Become the Market*, THE NATION (Feb. 15, 2018) (accessed via LEXISNEXIS) (As more third-party sellers have agreed to sign up for these services, Amazon has repeatedly raised its fees, with fulfillment fees rising [in 2018] by as much as 14 percent for standard-size items (and more for oversize goods), on top of similar increases in 2017.").

[88] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 11.

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 31 –

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

| Product | Fulfillment Fees (for shipping 1 item) | | | | Storage Fees (for 1 item stored for 2 months) | | | |
|---|---|---|---|---|---|---|---|---|
| | 2013 | 2016 | 2020 | Change 2013-2020 | 2013 | 2016 | 2020 | Change 2013-2020 |
| Athletic shirt | 2.46 | 3.42 | 3.70 | 50% | 0.02 | 0.07 | 0.07 | 250% |
| Baby cot | 7.65 | 8.38 | 10.92 | 43% | 0.66 | 0.99 | 1.05 | 59% |
| Bathroom scale | 4.51 | 5.57 | 6.56 | 45% | 0.19 | 0.52 | 0.58 | 205% |
| Coffeetable book | 3.30 | 3.94 | 6.56 | 99% | 0.08 | 0.23 | 0.25 | 213% |
| Cookware set | 12.21 | 15.51 | 19.28 | 58% | 2.51 | 3.77 | 4.01 | 60% |
| Desk organizer | 2.99 | 4.01 | 4.90 | 64% | 0.12 | 0.31 | 0.35 | 192% |
| Disposable plates | 3.75 | 4.79 | 5.80 | 55% | 0.11 | 0.30 | 0.34 | 209% |
| Doll | 3.37 | 4.40 | 5.80 | 72% | 0.26 | 0.70 | 0.79 | 204% |
| Dry erase board | 6.51 | 10.44 | 13.58 | 109% | 0.61 | 0.91 | 0.97 | 59% |
| Foam mattress | 42.59 | 44.98 | 55.44 | 30% | 9.64 | 25.63 | 28.93 | 200% |
| Football | 3.75 | 4.79 | 6.18 | 65% | 0.30 | 0.80 | 0.90 | 200% |
| Glass jars | 6.41 | 7.52 | 9.22 | 44% | 1.03 | 2.74 | 3.10 | 201% |
| Hammock | 23.97 | 25.87 | 29.31 | 22% | 2.80 | 4.21 | 4.48 | 60% |
| Hardcover book | 1.76 | 2.30 | 4.90 | 178% | 0.01 | 0.03 | 0.04 | 300% |
| Headphones | 2.16 | 2.71 | 5.42 | 151% | 0.18 | 0.48 | 0.55 | 206% |
| Phone case | 1.46 | 1.91 | 3.48 | 138% | 0.02 | 0.05 | 0.06 | 200% |
| Ping-pong table | 191.20 | 197.67 | 203.56 | 6% | 9.66 | 14.53 | 15.45 | 60% |
| Playstation console | 0.00 | 0.00 | 8.08 | n/a | 0.52 | 1.37 | 1.55 | 198% |
| Playstation controller | 1.46 | 1.91 | 3.31 | 127% | 0.03 | 0.08 | 0.09 | 200% |
| Printer | 14.49 | 15.90 | 17.76 | 23% | 1.92 | 2.89 | 3.07 | 60% |
| Roll of packing tape | 2.46 | 3.02 | 3.48 | 41% | 0.02 | 0.04 | 0.05 | 150% |
| Stapler | 2.46 | 3.02 | 3.48 | 41% | 0.01 | 0.03 | 0.04 | 300% |
| Stationary cycle | 111.32 | 112.98 | 193.55 | 74% | 13.75 | 20.70 | 22.01 | 60% |
| Surfboard pads | 4.99 | 6.15 | 8.26 | 66% | 0.06 | 0.15 | 0.17 | 183% |
| Toy cottage | 130.00 | 135.11 | 141.68 | 9% | 21.21 | 31.91 | 33.93 | 60% |
| Toy dump truck | 5.27 | 6.35 | 8.08 | 53% | 0.80 | 2.13 | 2.41 | 201% |
| Trilogy book set | 3.37 | 4.40 | 5.42 | 61% | 0.08 | 0.21 | 0.23 | 188% |
| Yard storage bench | 68.00 | 72.38 | 88.42 | 30% | 8.83 | 13.28 | 14.12 | 60% |
| Median Change, 2013-2020 | | | | 55% | | | | 190% |

96.     One Seller told federal lawmakers that "[d]espite the slow delivery times, Amazon's logistics fees were **35% higher** than other rapid shipping options offered by UPS and the U.S. Postal Service … ."[89]

97.     Amazon's supra-competitive pricing of its Fulfillment services is consistent with the other fees it charges Sellers—e.g., the referral fees that Amazon collects from Sellers for every item sold through its platform.

---

[89] Soper, *Amazon Accused of Forcing Up Prices*, *supra* note 26 (emphasis added).

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 32 –

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

98.     From 2015 to 2020, Amazon's "revenue from seller fees [grew]
two-and-a-half times as fast as total consumer spending on its site" because "it [was] taking
a larger cut of every dollar sellers make on the site."[90] In 2015, Amazon took $19 of every
$100 in sales that a Seller made on Amazon.com; by 2020, Amazon's cut had increased to
over $30 of every $100 in sales that a Seller made through the platform.[91]

99.     The ever-increasing pressure from Amazon on Sellers' bottom lines led
directly to Sellers increasing their prices to make margin. Consumers therefore absorb the
supra-competitive fees that Sellers pay to Amazon, including the fees that Sellers pay for
Fulfillment services.

100.     Despite all evidence to the contrary, Amazon continues to represent that the
purpose of the Buy Box is "[t]o give customers the best possible shopping experience," and
that Sellers' placement in the Buy Box is based on "performance-based requirements."[92]

101.     Amazon's actions during the COVID-19 pandemic prove otherwise.

**4.     COVID-19: Amazon Unmasked**

102.     By placing stress on Amazon's logistics system, the COVID-19 pandemic for
the first time gave consumers a clear view of the harms caused by Amazon's exploiting its
customers' loyalty to force Sellers to pay for Amazon's logistics services.

103.     As brick-and-mortar stores shuttered and people were directed to shelter in
place, millions of Americans were forced to turn to Amazon, leading the company's
revenues to skyrocket.

---

[90] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 4.
[91] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 4.
[92] *How the Featured Offer works*, AMAZON SELLER CENTRAL (last visited Jan. 19, 2022),
https://sellercentral.amazon.com/gp/help/external/37911?language=en-US.

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM
– 33 –
TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

104.    But consumers who were used to quick delivery were shocked to find that many of the items they ordered from Amazon didn't arrive for weeks.[93]

105.    Amazon sought to explain the delays by pointing out that it "was inundated with orders to the point that its warehousing and shipping system buckled."[94]

106.    But the main reason for the delays was Amazon's tying scheme, which is reflected in the Buy Box algorithm: "The variable that has the greatest impact on the Buy Box is the product's fulfillment method," and the Buy Box algorithm gives Fulfillment by Amazon a perfect score across all variables, *regardless of how Amazon's Fulfillment services actually performs against competing logistics methods used by Sellers*.[95]

107.    Amazon's Buy Box algorithm therefore continued to select products offered by Amazon or Sellers who used Amazon's Fulfillment services (the tied product), "[e]ven when it became clear that Amazon's logistics weren't up to the task, and that sellers on its marketplace could independently get orders to customers faster."[96]

108.    One Seller recounted the drastic steps it had to take to make a sale early in the pandemic despite having shipping times much faster than those available through Amazon's Fulfillment services:

> The manager of a company that sells on Amazon, who spoke on the
> condition of anonymity due to fear of retaliation, says that during the

---

[93] *See* Knox & Shaoul, *How Amazon Used the Pandemic to Amass More Monopoly Power*, *supra* note 13 ("At the height of the pandemic, with many storefronts shuttered over statewide shelter-in-place orders, shoppers who turned en masse to Amazon's ubiquitous online marketplace found many of the products they wanted wouldn't arrive for weeks. For a company 'obsessed' with consumer satisfaction, Amazon Prime was unable to deliver.").

[94] Knox & Shaoul, *How Amazon Used the Pandemic to Amass More Monopoly Power*, *supra* note 13.

[95] Lanxner, *The Amazon Buy Box*, *supra* note 22.

[96] Knox & Shaoul, *How Amazon Used the Pandemic to Amass More Monopoly Power*, *supra* note 13.

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 34 –

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

pandemic, their products in Amazon's fulfillment system saw

significant delays; it would be weeks before Amazon could get those

products to customers. The company had the same products in its

own warehouse that it could deliver to customers in days, not weeks.

But in order for shoppers to find those products [which did not appear

in the Buy Box], it had to drastically increase the prices of the

products stored in Amazon's warehouse, despite the far longer

shipping times. Only after jacking up the prices of their "Prime" offers

did the company see some increase in sales, albeit still a fraction of

their sales last March, the manager says.[97]

109.    Through March 2020, "Amazon was still giving 'Buy Box' preference to

offers that were fulfilled by Amazon's own logistics network, *even if the shipping time was*

*considerably longer (delays were reported of up to a month) and the price was more expensive*."[98]

110.    To avoid fallout from the harm that its anticompetitive Buy Box algorithm

was causing consumers, by April 2020 the company temporarily changed the algorithm so

that "[o]n Fulfilled By Merchant (FBM) offers similar to FBA offers, [Amazon gave]

preference to FBM in the algorithm."[99]

---

[97] Knox & Shaoul, *How Amazon Used the Pandemic to Amass More Monopoly Power*, *supra* note 13.

[98] Kiri Masters, *Amazon Gives A Boost To Merchants Who Fulfill Their Own Orders While Warehouses Struggle To Cope With COVID-19 Demand*, FORBES (Mar. 31, 2020), https://www.forbes.com/sites/kirimasters/2020/03/31/amazon-gives-a-boost-to-merchants-who-fulfill-their-own-orders-while-warehouses-struggle-to-cope-with-covid-19-demand/?sh=540e28056e1b.

[99] Mike O'Brien, *Amazon Adjusted Buy Box Algorithm, Rewarding Merchant Fulfilled Orders*, MULTICHANNEL MERCHANT (Apr. 7, 2020), https://multichannelmerchant.com/ecommerce/amazon-adjusted-buy-box-algorithm-rewarding-merchant-fulfilled-orders/.

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 35 –

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1      111.    One Seller who used both Fulfillment by Amazon and Fulfillment by

2   Merchant described the temporary change to Amazon's Buy Box algorithm as

3   "unprecedented":

4              Peter Marlega, director of operations at mobile phone accessory seller

5              Tech Armor, said he too had noticed and adapted to Amazon's buy

6              box algorithm change – in some cases raising the price of an FBA

7              offer so the FB[M] offer would win … .

8              "This is unprecedented in my experience," said Marlenga, who has

9              been in ecommerce since 2006 and has been using FBA for years.

10             "It's the smart thing for Amazon to do, because they're still getting

11             the sale. We've always done both FBA and FBM listings. But just

12             three weeks ago, even if made my FBM listing 75% of the FBA price,

13             the FBA offer still wins the buy box. I can even offer overnight

14             shipping, but FBA still wins."

15             The algorithm tweak has significantly improved conversion rates

16             [i.e., the number of page visits that result in a sale], Marlenga said.

17             Prior to the change, if Tech Armor had a product listed through FBA

18             and inventory ran out and its FBM offer won the buy box, the

19             conversion rate would still dip by 50% to 75% … .

20             "Now in [sic] when we have an FBM offer in the buy box, the

21             conversion rate is only down 10%–20% (from competing Prime

22             offers)," he said. "I imagine shoppers are searching and finding that

23

24

25

1  Prime eligible offers have a 21-plus day lead time and they're coming
2  back to us."[100]

3  112. Amazon used the record-breaking revenues and profits generated by the
4  pandemic to scale up its logistics business, "expand[ing] its logistics footprint by 50%" in
5  2020.[101]

6  113. Amazon's reputation as an online retailer would have taken a serious hit
7  during the pandemic but for its decision to temporarily change the Buy Box algorithm to
8  present consumers with offers from Sellers that offered a lower price and faster shipping
9  than Amazon or Sellers who used the company's Fulfillment services.

10  114. With its self-inflicted crisis averted, Amazon soon returned to its former Buy
11  Box algorithm, designed to effectuate its tying scheme and prioritize the expansion of
12  Amazon's logistics business over the company's steadfastly loyal consumers.

13  **C.  Econ 101: How Amazon's Strong-Arming of Sellers Leads Directly to Higher Prices for Consumers**
14
15  115. Amazon's tying a Seller's access to the Buy Box on the Seller paying for the
16  company's Fulfillment services is unlawful and harmful to Sellers. But Amazon's violation
17  of the antitrust laws also injures consumers by overcharging them for purchases made on
18  Amazon.com in at least four different ways.

---

[100] *Id.*
[101] Katherine Khashimova Long, *Amazon posts record sales and profit, with no slowing expected*, SEATTLE TIMES ONLINE (Feb. 2, 2021) (accessed via LEXISNEXIS).

CONSOLIDATED AMENDED          – 37 –          TERRELL MARSHALL LAW GROUP PLLC
CLASS ACTION COMPLAINT                        936 North 34th Street, Suite 300
Case No. 2:21-cv-693-RSM                      Seattle, Washington 98103-8869
                                              TEL. 206.816.6603 • FAX 206.319.5450
                                              www.terrellmarshall.com

1

2

**1.   Amazon directs consumers to purchase items from Sellers who use Fulfillment by Amazon, even if a non-FBA Seller is offering the item for a lower total price.**

3

116.   The Buy Box offers consumers items that are either by Amazon or by Sellers

4

who pay for Fulfillment in the Buy Box, even if the same item is offered by a non-FBA

5

Seller at a lower total price and equivalent (or better) shipping times.

6

117.   As ProPublica's 2016 investigation found, "[a]bout three-quarters of the time,

7

Amazon placed its own products and those of companies that pay for its services

8

[e.g., Fulfillment by Amazon] in [the Buy Box] *even when there were substantially cheaper*

9

*offers available from others*," and "[m]ost Amazon shoppers end up clicking 'add to cart' for

10

the offer highlighted in the buy box."[102]

11

118.   A comment by a Seller on the Amazon Services Seller Forum echoes

12

ProPublica's findings:

13

14

> Only reason so many overpriced items have actually sold is due to the
>
> fact the buyer is being duped by amazon.

15

16

17

18

> When they force a buy box position to an over priced seller the buyers
>
> typically did not know and just ASSUMED amazon was operating in
>
> good faith and in the buyers best interest. When in fact they were
>
> not.[103]

19

119.   Although the majority of Sellers have been forced by Amazon to use

20

Fulfillment by Amazon and therefore have access to the Buy Box, there are still non-FBA

21

22

23

[102] Angwin & Mattu, *Amazon Says It Puts Customers First*, *supra* note 76 (emphasis added).
[103] Seller Skeeter, *Items are priced higher on Amazon than at other retailers*, Amazon

24

Services Seller Forum (Apr. 4, 2019),
https://sellercentral.amazon.com/forums/t/items-are-priced-higher-on-amazon-than-at-

25

other-retailers/450662.

Terrell Marshall Law Group PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
Tel. 206.816.6603 • Fax 206.319.5450
www.terrellmarshall.com

1    Sellers who do not appear in the Buy Box and whose listings give lie to Amazon's

2    representation that the Buy Box offers consumers the best deal.

3         120.   For example, the image below shows that Amazon's offer of $126.85 for a set

4    of kitchen knives won the Buy Box even though a Seller offered the same item for $1.06 less,

5    and both Amazon and the Seller offered free shipping:



16        121.   The next image is a striking illustration of how Sellers are forced to pay for

17   Amazon's Fulfillment services. Seller PConline365 offers a Dell Inspiron laptop for sale and

18   provides both Fulfillment by Amazon ("Shops from Amazon.com") and Fulfillment by

19   Merchant ("Ships from PConline 365"). The price offered is identical, but the free shipping

20   offered by the Seller is 3 days *faster* than Amazon's shipping. Nonetheless, the item that won

21   the Buy Box is the one that was warehoused and shipped by Amazon:

1

2

3

4

5

6

7

8

9

10

11

12

13

14



15    122.    Some of the biggest price differences appear when an item is *not* sold by

16  Amazon, but by two Sellers—a Seller that handles its own shipping and a Seller that pays

17  for Fulfillment services and therefore wins the Buy Box. In the following example, the Seller

18  that is paying for FBA won the Buy Box, even though the other Seller's price was $20.01—

19  or 25%—lower:

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13



14       123.    While the delivery-time estimates do vary for the two Sellers in the above

15 example, the only obvious reasons for Amazon's algorithm placing the item that is 25%

16 more expensive in the Buy Box are (i) to ensure that the sale goes to the Seller who pays for

17 Amazon's Fulfillment Services and (ii) to get higher referral fees from the sale. Given that

18 Sellers pay Amazon 15% of the sale price for any item in the "Kitchen" category, Amazon

19 would earn $3.90 more in referral fees if the consumer purchase the item from the FBA

20 Seller.[104]

21

22

23

24

25     [104] 0.15 × ($80 - $54) = $3.90.

CONSOLIDATED AMENDED          – 41 –          TERRELL MARSHALL LAW GROUP PLLC
CLASS ACTION COMPLAINT                       936 North 34th Street, Suite 300
Case No. 2:21-cv-693-RSM                       Seattle, Washington 98103-8869
                                       TEL. 206.816.6603 • FAX 206.319.5450
                                       www.terrellmarshall.com

**2.    The Buy Box algorithm's preference for Sellers who purchase Amazon's Fulfillment services decreases price competition among Sellers, resulting in consumers paying higher prices than they would have but for Amazon's unlawful tying arrangement.**

124.    The Buy Box algorithm presents the consumer with an offer from a Seller who pays for Fulfillment by Amazon, even if another Seller with faster (non-FBA) shipping is selling the same item for a lower price.

125.    In this way, Amazon has intentionally designed its algorithm to force Sellers to purchase the company's Fulfillment services or risk going out of business, as 90% of the purchases on Amazon.com are made through the Buy Box.

126.    Amazon's design of the Buy Box algorithm leads directly to a decrease in price competition, given that the vast majority—73%—of Sellers use Amazon's Fulfillment services.

127.    With 73% of Sellers assured that they will win the Buy Box based on their paying for Fulfillment by Amazon *even if a non-FBA Seller is offering a lower price and faster delivery*, the incentive to compete based on price is greatly reduced.

128.    Because there is less price competition among FBA Sellers, the prices for items featured in the Buy Box are higher than they would be but for Amazon's scheme to expand its logistics business by forcing Sellers to use its Fulfillment services.

**3.    Sellers pass on the supra-competitive cost of Fulfillment by Amazon to consumers in the form of higher prices.**

129.    Sellers who purchase Amazon Fulfillment services to win the Buy Box are able to—and do—charge higher prices than they would but for Amazon's anticompetitive conduct.

130.    A fundamental principle of economics is that a business will increase the price of a product if it can do so without decreasing demand for the product. For several reasons,

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 42 –

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

the price of items sold through Amazon.com is relatively inelastic, meaning (among other things) that an increase in price does not lower demand.

131.    As explained in the House Subcommittee's Report, Prime members—who account for the vast majority of sales on Amazon.com[105]—are relatively insensitive to increases in price:

> Once Prime members pay the upfront annual membership fee, they are likely to concentrate their online purchases with Amazon . . . . As one market participant observed, "Prime members will continue to use Amazon and not switch to competing platforms, ***despite higher prices and lower-quality items on Amazon*** compared to other marketplaces, ***and despite recent increases in the price of a Prime membership***."[106]

132.    Higher prices also are unlikely to prompt Amazon's customers to shop elsewhere given the "switching costs associated with consumers shopping outside of the Amazon ecosystem."[107]

---

[105] Most people who purchase items through Amazon are Amazon Prime members, *see* Sabanoglu, *Number of Amazon Prime users in the United States from 2017 to 2022*, *supra* note 51 (showing that there were 142.5 million Prime members in United States in 2020), and Prime members also account for the vast majority of sales through Amazon, "spend[ing] an average of $1,400 annually on Amazon, versus $600 [spent annually by] non-members." House Subcommittee Report, *supra* note 8, at 260.

[106] House Subcommittee Report, *supra* note 8, at 260 (emphasis added); *see also* Fishman, *Amazon, the Price Perception Leader*, *supra* note 53 ("Amazon loyalists shop on Amazon.com trusting that they are getting a bargain. . . . [I]t's this perception of low pricing that helps make shopping on Amazon almost instinctual to many consumers. It's this perception that keeps Amazon shoppers from checking other sites for lower pricing before hitting the 'Place Your Order' button. It makes retail shoppers check their Amazon app before heading to the register. It's enough to convince folks to make purchases with just an Alexa voice command or a Dash button-push without concern for how little visibility they have into actual market pricing.").

[107] House Subcommittee Report, *supra* note 8, at 260.

133.     Accordingly, the ever-increasing fees that Sellers are charged by Amazon—including fees for Amazon's Fulfillment services—are "being absorbed by consumers in the form of higher prices."[108] Because Prime member purchasers are relatively insensitive to price increases, Sellers can and do pass on the cost of Amazon's Fulfillment services instead of, for example, absorbing the increased costs through lower profit margins.

134.     Sellers themselves report that they have to increase their prices because of the fees charged by Amazon. In one thread on the Amazon Services Seller Forum, titled "Items are priced higher on Amazon than at other retailers," an Amazon Seller wrote: "On Amazon we can control our pricing and *we build in all amazon fees*. Therefore after all fees we charge a certain price based on percentage."[109]

135.     Another Seller on the same thread wrote: "[I]f they [Amazon] want to have the highest fees on the internet for 3rd party sellers, they are also going to be the least likely place to find the best deal. If they brought their fees down to be in line with the other platforms like eBay, they'd be more likely to at least have price parity with other platforms."[110]

136.     A third Seller likewise confirmed that Amazon Sellers charge consumers more because of the high fees imposed by Amazon:[111]

---

[108] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 6.

[109] Post by Seller plastic-gur, *Items are priced higher on Amazon than at other retailers*, AMAZON SERVICES SELLER FORUM (Apr. 3, 2019), https://sellercentral.amazon.com/forums/t/items-are-priced-higher-on-amazon-than-at-other-retailers/450662.

[110] Post by Seller AudioFan, *Items are priced higher on Amazon than at other retailers*, AMAZON SERVICES SELLER FORUM (Apr. 3, 2019), https://sellercentral.amazon.com/forums/t/items-are-priced-higher-on-amazon-than-at-other-retailers/450662.

[111] Post by Seller OMP, *Items are priced higher on Amazon than at other retailers*, AMAZON SERVICES SELLER FORUM (Apr. 4, 2019), https://sellercentral.amazon.com/forums/t/items-are-priced-higher-on-amazon-than-at-other-retailers/450662.

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 44 –

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com



4.    **FBA Sellers' charging consumers higher prices enables Amazon to do the same.**

137.    Because many items on Amazon's website are sold by both Amazon and its Sellers, the Sellers' increasing prices to offset the supra-competitive cost of Fulfillment services enables Amazon to charge higher prices on items that are identical (or comparable) to those sold by FBA Sellers.

138.    As with Sellers, one factor that enables Amazon to increase its prices is that the price of items sold on Amazon.com—and especially through the Buy Box—is very inelastic, in large part due to the (often misplaced) brand loyalty of Amazon shoppers.

139.    Amazon uses algorithms to price its items. The company "changes product prices 2.5 million times a day," based on its analyses of "customer's shopping patterns, competitors' prices, profit margins, inventory, and a dizzying array of other factors."[112] One of Amazon's principal pricing strategies is to "undercut [its] competitors [i.e., Sellers] on popular products."[113]

---

[112] Neel Mehta, Parth Detroja & Aditya Agashe, *Amazon changes prices on its products about every 10 minutes — here's how and why they do it*, BUSINESS INSIDER (Aug. 10, 2018), https://www.businessinsider.com/amazon-price-changes-2018-8?op=1.
[113] *Id.*

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 45 –

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

140.    This means that, when a Seller raises the price of a product to offset the supra-competitive fees it pays for Amazon's Fulfillment services, Amazon's algorithm has room to raise Amazon's prices while still undercutting the Seller.

141.    Thus, the consumer is being overcharged regardless of whether the consumer purchases the item from Amazon or the Seller.

**D.     Amazon's Reign of Terror Over Sellers**

142.    Although countless Sellers are injured by Amazon's unlawful tying scheme, the vast majority of them passively accept Amazon's flagrant violation of the antitrust laws. There are two reasons for this: (i) Sellers fear retaliation by Amazon and (ii) the onerous contract terms imposed on Sellers by Amazon quash any incentive to challenge Amazon's anticompetitive actions.

143.    As one market participant told the House Subcommittee: "It would be commercial suicide to be in Amazon's crosshairs . . . If Amazon saw us criticizing, I have no doubt they would remove our access and destroy our business."[114] As the House Subcommittee Report notes, a "single tweak of an algorithm" by a platform like Amazon "could cause significant costs if not financial disaster—with little recourse."[115]

144.    Sellers' fears are well founded. Amazon has a long history of retaliating "to coerce publishers to accept contractual terms that impose substantial penalties for promoting competition with Amazon's rivals."[116]

145.    Amazon has retaliated against book publishers by, among other things, (i) "removing the 'buy' button, which blocks a customer's ability to purchase a publisher's current titles," (ii) "removing the 'pre-order' button, which eliminates the ability for a

---

[114] House Subcommittee Report, *supra* note 8, at 74 (internal quotation marks omitted).
[115] House Subcommittee Report, *supra* note 8, at 74.
[116] House Subcommittee Report, *supra* note 8, at 269 (internal quotation marks omitted).

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 46 –

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   consumer to pre-order a publishers' forthcoming titles," and (iii) "showing publishers' titles

2   as out of stock or with delayed shipping times."[117]

3       146.   As the House Subcommittee Report succinctly puts it, "Amazon can treat

4   sellers in this manner because it knows that sellers have no other realistic alternatives to the

5   platform."[118]

6       147.   Even those Sellers who are willing to risk taking on Amazon are effectively

7   precluded from doing so by the arbitration clauses they are required to sign to obtain access

8   to the online retail market through Amazon.[119]

9       148.   Whereas filing fees in federal court are a few hundred dollars, the total

10  "administrative fees" for a Seller filing an arbitration claim against Amazon range from

11  $1,725[120] for claims of less than $75,000 to as high as $78,750 for claims of $10 million and

12  above.[121]

13      149.   Even worse, under Amazon's "Services Business Solutions Agreement,"

14  Sellers who are injured by Amazon's tying arrangement or retaliatory conduct cannot

15

16

17

18  ―――――――――――

19  [117] House Subcommittee Report, *supra* note 8, at 269.

    [118] House Subcommittee Report, *supra* note 8, at 269.

20  [119] *See* House Subcommittee Report, *supra* note 8, at 273.

    [120] *See AAA's Commercial Arbitration Rules and Mediation Procedures: Fee Schedule*

21  [hereinafter *AAA Fee Schedule*] (May 1, 2018), available at http://www.adr.org/sites/
    default/files/Commercial_Arbitration_Fee_Schedule_1.pdf; *Amazon Services Business*

22  *Solutions Agreement*, AMAZON, at ¶ 18 (last visited Jan. 19, 2022) (providing that arbitration
    is to "be conducted by the American Arbitration Association (AAA) under its commercial

23  rules"), https://sellercentral.amazon.com/gp/help/external/1791?language=en-US. This
    includes a $925 initial filing fee plus $800 final fee. *See AAA Fee Schedule*.

24  [121] This includes an initial filing fee of $11,000 plus .01% of the claim amount above

25  $10,000,000 up to $65,000, *plus* a final fee of $13,750. *See AAA Fee Schedule*, *supra* note 120.

CONSOLIDATED AMENDED            – 47 –            **TERRELL MARSHALL LAW GROUP PLLC**
CLASS ACTION COMPLAINT                           936 North 34th Street, Suite 300
Case No. 2:21-cv-693-RSM                         Seattle, Washington 98103-8869
                                                 TEL. 206.816.6603 • FAX 206.319.5450
                                                 www.terrellmarshall.com

1  recover the full amount of those injuries because the Agreement purports to essentially

2  eliminate Amazon's liability for *any* injury it inflicts on a Seller:[122]

> **8. Limitation of Liability.**
>
> We WILL NOT BE LIABLE (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE, PRODUCT LIABILITY, OR OTHER THEORY), OR OTHERWISE) TO YOU OR ANY OTHER PERSON FOR COST OF COVER, RECOVERY, OR RECOUPMENT OF ANY INVESTMENT MADE BY YOU OR YOUR AFFILIATES IN CONNECTION WITH THIS AGREEMENT, OR FOR ANY LOSS OF PROFIT, REVENUE, BUSINESS, OR DATA OR PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT, EVEN IF AMAZON HAS BEEN ADVISED OF THE POSSIBILITY OF THOSE COSTS OR DAMAGES. FURTHER, OUR AGGREGATE LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED WILL NOT EXCEED AT ANY TIME THE TOTAL AMOUNTS DURING THE PRIOR SIX MONTH PERIOD PAID BY YOU TO AMAZON IN CONNECTION WITH THE PARTICULAR SERVICE GIVING RISE TO THE CLAIM.

14    150.    The onerous terms of Amazon's Agreement with its Sellers make clear why

15  "sellers rarely initiate arbitration actions against Amazon":[123]

16         Between 2014 and 2019, even as the number of Amazon sellers

17         continued to grow by hundreds of thousands per year, only 163 sellers

18         and 16 vendors initiated arbitration proceedings. Because sellers are

19         generally aware that the process is unfair and unlikely to result in a

20         meaningful remedy, they have little incentive to bring an action.[124]

---

[122] *Amazon Services Business Solutions Agreement*, *supra* note 145.
[123] House Subcommittee Report, *supra* note 8, at 273.
[124] House Subcommittee Report, *supra* note 8, at 273.

1  **V.     CLASS ACTION ALLEGATIONS**

2  151.    Plaintiffs brings this action on behalf of themselves and, under Federal Rule of

3  Civil Procedure 23(a), (b)(2), and (b)(3), as representatives of a Class defined as follows:

4  All persons who, while residing in the United States, purchased an

5  item during the Relevant Period through Amazon's Buy Box, and the

6  order was then shipped (or "fulfilled") by Amazon.

7  152.    For purposes of this Complaint, the Relevant Period is January 1, 2013

8  through the present.

9  153.    Excluded from the Class are Defendant Amazon and any entity in which

10  Defendant has a controlling interest, as well as any of Defendant's legal representatives,

11  officers, directors, assignees, and successors.

12  154.    Members of the Class are so numerous that joinder of all Class Members is

13  impractical. Currently, there are more than 140 million Amazon Prime members in the

14  United States who spend an average of $1,400 annually on the website. Likewise, there are

15  millions of Amazon shoppers without a Prime membership who spend an average of $600

16  annually on the website. Given that 90% of purchases on Amazon's website are made

17  through the Buy Box, a conservative estimate is that there are at least 135 million Class

18  Members. Class Members are readily identifiable from information and records in

19  Amazon's possession.

20  155.    Plaintiffs' claims are typical of the claims of the members of the Class.

21  Plaintiffs and Class Members were aggrieved by the same wrongful conduct of Amazon:

22  Amazon's tying arrangement steered consumers toward Sellers who paid for Amazon's

23  Fulfillment services, even when the total price charged by those Sellers was higher than that

24  of Sellers who did not use FBA. Amazon's tying arrangement further led to Sellers

25

1    increasing prices to offset the supra-competitive costs of FBA and to Amazon itself raising

2    prices on its own products.

3        156.    Plaintiffs will fairly and adequately protect and represent the interests of the

4    Class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the

5    other members of the Class.

6        157.    Plaintiffs are represented by counsel with experience in the prosecution of

7    class actions and with particular experience with antitrust class actions.

8        158.    Questions of law and fact common to the members of the Class predominate

9    over questions that may affect only individual Class Members because Amazon has acted

10   on grounds generally applicable to the entire Class, thereby making damages with respect to

11   the Class as a whole appropriate. Such generally applicable conduct is inherent in Amazon's

12   wrongful actions.

13       159.    Questions of law and fact common to the Class include:

14           a.    Whether Amazon conditions Sellers' access to the Buy Box on

15                 their purchasing Fulfillment services from Amazon.

16           b.    Whether Amazon has significant market power over the Buy

17                 Box.

18           c.    Whether Amazon has significant market power over

19                 e-commerce generally.

20           d.    Whether Amazon used its market power to force Sellers to

21                 purchase Amazon's Fulfillment services.

22           e.    Whether Amazon's conduct is a violation of Section 1 of the

23                 Sherman Act, 15 U.S.C. § 1, and if so, whether it is a *per se*

24                 violation.

25

1     f. Whether Amazon has monopoly power in the U.S. online

2       retail-goods market or the market for favorable Seller

3       placement on the Amazon website (e.g., the Buy Box).

4     g. Whether Amazon used its monopoly power to foreclose

5       competition, to gain advantage, or to destroy competitors in

6       the market for logistics—the warehousing, packing, and

7       shipping of retail goods to consumers.

8     h. Whether Amazon's conduct is a violation of Section 2 of the

9       Sherman Act, 15 U.S.C. § 2.

10     i. Whether Amazon charged supracompetitive prices as a result

11       of its anticompetition conduct.

12     j. Whether Sellers' prices were and are higher than they would

13       have been but for Amazon's conditioning Sellers' access to the

14       Buy Box on their purchasing Fulfillment services from

15       Amazon.

16     k. Whether Amazon's prices were and are higher than they

17       would have been but for Amazon's conditioning Sellers' access

18       to the Buy Box on their purchasing Fulfillment services from

19       Amazon.

20     l. Whether Amazon should be enjoined from conditioning

21       Sellers' access to the Buy Box on their purchasing Fulfillment

22       services from Amazon.

23   160. Class-action treatment is a superior method for the fair and efficient

24 adjudication of the controversy. Such treatment will permit a large number of similarly

25

CONSOLIDATED AMENDED    – 51 –   TERRELL MARSHALL LAW GROUP PLLC
CLASS ACTION COMPLAINT        936 North 34th Street, Suite 300
Case No. 2:21-cv-693-RSM        Seattle, Washington 98103-8869
                 TEL. 206.816.6603 • FAX 206.319.5450
                 www.terrellmarshall.com

situated persons to prosecute their common claims in a single forum simultaneously,
efficiently, and without the unnecessary duplication of evidence, effort, or expense that
numerous individual actions would engender. The benefits of proceeding through the class
mechanism, including providing injured persons or entities a method for obtaining redress
on claims that could not practicably be pursued individually, substantially outweighs
potential difficulties in management of this class action.

161.    Plaintiffs know of no special difficulty to be encountered in the maintenance
of this action that would preclude its maintenance as a class action.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Discovery-Rule Tolling

162.    The discovery rule tolls the running of the statute of limitations until a
plaintiff knows or has reason to know of the injury which is the basis of the action.

163.    The discovery rule tolled the statute of limitations in this case until at least
November 8, 2019, when major news outlets reported that a Seller had sent a letter to
federal lawmakers, "accus[ing] Amazon of forcing him and other sellers to use the
company's expensive logistics services, which in turn forces them to raise prices for
consumers."[125]

164.    Although it previously had been reported that Sellers could increase their
chances of "winning" the Buy Box by paying for Fulfillment by Amazon, neither Plaintiffs
nor other consumers had any reason to read articles about winning Amazon's Buy Box.

165.    More importantly, even consumers who may have read an article before
November 2019 about the Buy Box algorithm did not know or have reason to know of the
injury—higher prices for Buy Box items—that is the basis of this action. Knowing of this

---

[125] *See, e.g.*, Soper, *Amazon Accused of Forcing Up Prices*, *supra* note 25.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   injury would have required a consumer to have understanding or knowledge of, among

2   other things: (i) economics, (ii) Amazon's business model, (iii) the operation of Amazon's

3   Buy Box algorithm, (iv) Amazon's charging Sellers more for its Fulfillment services than

4   competing logistics companies who offered comparable or better logistics services, and

5   (v) that Sellers were able to pass the cost of Amazon's overprices Fulfillment services on to

6   consumers.

7       166.    Plaintiffs and Class Members could not have reasonably discovered their

8   injury until a Seller came forward in November 2019 to alert lawmakers that Amazon's

9   tying arrangement was leading to higher prices for consumers.

10      167.    For the above reasons, the applicable statute of limitations has been tolled by

11  operation of the discovery rule.

12  **B.    Fraudulent-Concealment Tolling**

13      168.    The applicable statute of limitations also has been tolled by Amazon's

14  fraudulent concealment throughout the period relevant to this action of the fact that its tying

15  scheme was leading to higher prices for consumers who made purchases through the Buy

16  Box.

17      169.    Throughout the relevant period, Amazon's CEO Jeff Bezos made numerous

18  public statements about Amazon's prices that constitute affirmative acts to mislead the

19  public.

20      170.    This is evidenced by Bezos's annual letters to shareholders, which regularly

21  touted Amazon's commitment to "relentlessly lowering prices":[126]

22

23

24      [126] Jeff Bezos, *Letters to Amazon Shareholders, 1997 to 2020,* (emphasis added), *available at*
    https://bettertomorrowfinancial.com/wp-content/uploads/2021/04/jeff-bezos-amazon-
25  shareholder-letters-1997_2020.pdf.

1   (i) 2002: "People see that we're determined to offer both world-

2     leading customer experience and the **lowest possible**

3     **prices** … . Our pricing objective is not to discount a small

4     number of products for a limited period of time, but to offer

5     **low prices everyday** and apply them broadly across our entire

6     product range."[127]

7   (ii) 2003: "Eliminating defects, improving productivity, and

8     passing the resulting cost savings back to customers in the form

9     of **lower prices** is a long-term decision."[128]

10   (iii) 2005: "[W]e have made a decision **to continuously and**

11     **significantly lower prices for customers year after year** as our

12     efficiency and scale make it possible. … Our judgment is that

13     relentlessly returning efficiency improvements and scale

14     economies to customers **in the form of lower prices** creates a

15     virtuous cycle that leads over the long term to a much larger

16     dollar amount of free cash flow, and thereby to a much more

17     valuable Amazon.com."[129]

18   (iv) 2008: "Our pricing objective is to earn customer trust, not to

19     optimize short-term profit dollars. We take it as an article of

20     faith that pricing in this manner is the best way to grow our

21     aggregate profit dollars over the long term. We may make less

22     per item, but by consistently earning trust we will sell many

23

24  [127] *Id.* (emphasis added)

25  [128] *Id.* (emphasis added).

  [129] *Id.* (emphasis added).

CONSOLIDATED AMENDED   – 54 –   TERRELL MARSHALL LAW GROUP PLLC
CLASS ACTION COMPLAINT        936 North 34th Street, Suite 300
Case No. 2:21-cv-693-RSM       Seattle, Washington 98103-8869
               TEL. 206.816.6603 • FAX 206.319.5450
               www.terrellmarshall.com

more items. Therefore, **we offer low prices across our entire**
**product range**."[130]

(v)  2009: "The financial results for 2009 reflect the cumulative
effect of 15 years of customer experience improvements:
increasing selection, speeding delivery, reducing cost structure
so **we can afford to offer customers ever-lower prices**, and
many others. … We are proud of our low prices … ."[131]

(vi)  2012: "**We lower prices and increase value for customers**
**before we have to.**"[132]

(vii)  2015: "Our approach to pricing is also driven by our customer-
centric culture—**we've dropped prices 51 times**, in many
cases before there was any competitive pressure to do so."[133]

(viii)  2020: "We offer **low prices**, vast selection, and fast
delivery … ."[134]

171.    Over the past 20 years, Bezos's message (Amazon is determined to offer the
lowest possible prices) has been relentlessly amplified by advertising and the news media.

172.    In short, Amazon deliberately hoodwinked the public into believing that it
was continuously laboring away to keep down prices by any means necessary
when in fact the opposite was true. Amazon was highlighting products in its coveted Buy
Box—which results in 90% of its sales—based not on the lowest price but rather on its
unlawful tying scheme, which led to higher prices for consumers and more profit for

---

[130] *Id.* (emphasis added).
[131] *Id.* (emphasis added).
[132] *Id.* (emphasis added).
[133] *Id.* (emphasis added).
[134] *Id.* (emphasis added).

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 55 –

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   Amazon. The statute of limitations is therefore tolled by Amazon's fraudulently concealing

2   the overcharges incurred by consumers as a result of the company's tying scheme.

## VII.   CLAIMS FOR RELIEF

### Claim 1: Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) –

### Unlawful Tying Arrangement

6       173.   Plaintiffs repeat and incorporate by reference all preceding paragraphs and

7   allegations.

8       174.   Amazon's tying arrangement is a *per se* violation of 15 U.S.C. § 1.[135]

9       175.   Amazon offered Sellers two distinct products or services in two different

10  markets:

11          (i)     **the tying product**, namely placement in the Buy Box, which is

12                  a product or service in the market for favorable product

13                  placement on Amazon's website, and on the internet more

14                  broadly; and

15          (ii)    **the tied product**, namely Fulfillment by Amazon, which is a

16                  service in the market for logistics for retail goods in the United

---

[135] *See, e.g.*, *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 n.7 (9th Cir. 2012) ("A tying arrangement will constitute a per se violation of the Sherman Act if the plaintiff proves (1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market." (citations and internal quotation marks omitted)); *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 316 (7th Cir. 2006) ("In order to establish the per se illegality of a tying arrangement, a plaintiff must show that: (1) the tying arrangement is between two distinct products or services, (2) the defendant has sufficient economic power in the tying market to appreciably restrain free competition in the market for the tied product, and (3) a not insubstantial amount of interstate commerce is affected." (citations omitted)).

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 56 –

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1       States—namely, the warehousing, packing, and shipping of

2       retail goods.

3       176.    Amazon possesses appreciable economic power in the market for favorable

4  product placement on Amazon's website (including placement in the Buy Box) and in the

5  market for favorable product placement on the internet generally.

6       177.    Amazon's economic power in the market for favorable placement on

7  Amazon's website (the tying product)—and in the market for favorable product placement

8  in e-commerce more broadly—was and is sufficient to coerce Sellers to purchase Amazon's

9  Fulfillment services (the tied product). The livelihoods of the majority of Sellers depends on

10 sales made through Amazon's website. Sellers knew that if they did not agree to purchase

11 Amazon's Fulfillment services, their livelihoods would be ruined, as they would not appear

12 in the Buy Box or be prominently displayed in Amazon's search results.

13      178.    Amazon's anticompetitive scheme affects a not-insubstantial volume of

14 commerce in the product market for logistics. Approximately $163 billion products are sold

15 through Amazon's website every year.[136] The majority of those products are shipped

16 through Amazon's Fulfillment services. Amazon's anticompetitive conduct has decreased

17 competition in the logistics market (the tied product market) and has put numerous

18 competitors in that market out of business.

19      179.    Alternatively, even if Amazon's conduct is not a *per se* violation of Section 1,

20 Amazon has violated Section 1 under the rule of reason because it has unreasonably

21 restrained competition.

22

23

24

---

[136] Carmen Ang, *Visualized: A Breakdown of Amazon's Revenue Model*, VISUAL CAPITALIST
25 (Oct. 14, 2020), https://www.visualcapitalist.com/amazon-revenue-model-2020/.

180.     Specifically, Amazon suppressed and continues to suppress competition in the market for logistics services inside the United States.[137] And there is a substantial threat that Amazon will acquire market power in that market. Amazon has overtaken the U.S. Postal Service in terms of number of parcels, "deliver[ing] 2.5 billion parcels [in 2019], or about one-fifth of all e-commerce deliveries."[138] One analysis anticipates that Amazon will "overtake UPS and FedEx in market share by 2022."[139]

181.     Moreover, favorable placement of a product on Amazon's website—and in e-commerce more broadly—is completely distinct from logistics services. The two products or services cannot and should not be viewed as one.

182.     Amazon's unlawful tying arrangement has injured Plaintiffs and Class Members by directly leading to higher prices for items that Plaintiffs and Class Members purchased through Amazon's Buy Box.

**Claim 2: Violation of Section 2 of the Sherman Act (15 U.S.C. § 2) – Use of Monopoly Level of Power to Harm Competition Through Tying Scheme**

183.     Plaintiffs repeat and incorporates by reference all preceding paragraphs and allegations.

184.     Amazon has violated 15 U.S.C. § 2 by using its monopoly level of market power in one or more markets to foreclose competition, gain a competitive advantage, or destroy a competitor in a different market.[140]

---

[137] *See generally* Zvi Schreiber, *How Logistics Is Proving that Amazon Needs to Be Regulated*, FREIGHTOS (May 14, 2019) ("Amazon is taking its dominance from retail to marketplace to fulfillment logistics. And now it's going further into shipping, using its advantages to offer freight and shipping."), https://www.freightos.com/how-logistics-is-proving-that-amazon-needs-to-be-regulated/

[138] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 2.

[139] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 2.

[140] *See Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 480–86 (1992) (stating that two elements of a Section 2 claim in tying context are (i) "possession of monopoly power in

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 58 –

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

185.     Amazon has a monopoly level of market power in two markets (the tying-product markets): (i) the online retail market in the United States (also referred to as the retail e-commerce market), in which Amazon controls about 65% to 70% of all marketplace sales, and (ii) the market for placement in Amazon's Buy Box, over which Amazon has complete control.

186.     The retail e-commerce market is recognized by the industry and the public as distinct from the brick-and-mortar retail market, and the two markets are different in numerous ways. For example, "unlike brick-and-mortar stores—where everyone at least sees a common price (even if they go on to receive discounts)—internet retail enables firms to entirely personalize consumer experiences, which eliminates any collective baseline from which to gauge price increases or decreases."[141] Moreover, "[w]hereas brick-and-mortar stores are generally only able to collect information on actual sales, [e-commerce retailers like] Amazon track[ ] what shoppers are searching for but cannot find, as well as which products they repeatedly return to, what they keep in their shopping basket, and what their mouse hovers over on the screen."[142] More than anything, the retail e-commerce market is distinct because of the many conveniences it offers to consumers, including the ease of comparison shopping, the elimination of travel time, unprecedented breadth of inventory, and low prices.[143]

the relevant market" and (ii) the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor" (citations and internal quotation marks omitted)).)

[141] Khan, *Amazon's Antitrust Paradox*, *supra* note 14, at 764.

[142] Khan, Amazon's Antitrust Paradox, supra note 14, at 782.

[143] *See, e.g., Thompson v. 1-800 Contacts, Inc.*, No. 2:16-CV-1183-TC, 2018 U.S. Dist. LEXIS 83806, at *26 (D. Utah May 17, 2018) (concluding that plaintiffs "plausibly alleged that the relevant product market [was] the *online market* for contact lenses" by, among other things, stating in their complaint that "[c]ustomers who shop online prefer the convenience of online shopping, home delivery and low prices. Online retailers' ability to offer a unique

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 59 –

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

187.     Amazon is able to profitably establish small but significant non-transitory price increases, beyond the competitive prices, on products sold through Amazon.

188.     Amazon used its power in one or both these markets to foreclose competition, to gain a competitive advantage, or to destroy competitors in the United States market for logistics services for retail goods (the tied-product market)—namely, the warehousing, packing, and shipping of retail goods.

189.     By tying a Seller's access to the Buy Box to a Seller's purchasing FBA, Amazon has used its monopoly level of power to force many Sellers who would otherwise prefer a different logistics provider to instead pay for Amazon's Fulfillment services.

190.     This has undoubtedly provided Amazon a competitive edge in the market for logistics services for retail goods. As one Seller told the House Subcommittee, but for Amazon's linking Buy Box access to a Seller's use of its Fulfillment services, "they would not choose to use FBA, as they found Amazon's fulfillment service was often slower and less reliable than self-fulfillment."[144]

191.     A recent report analyzing Amazon's monopoly power succinctly summarizes Amazon's violation of Section 2:

> Amazon's exploitation of sellers is about more than extracting revenue from them. Amazon is also leveraging its dominance over sellers to gain market power in other sectors, furthering its monopoly strategy. Amazon has, for example, *compelled sellers to buy its warehousing and fulfillment services in order to get the kind positioning on its site that leads to sales*. Almost overnight *this move has catapulted*

---

combination of selection, depth and breadth of inventory, and delivery speed appeals to these customers." (emphasis added) (citations and internal quotation marks omitted)).

[144] House Subcommittee Report, *supra* note 8, at 289–90.

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM                – 60 –                TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1                 ***Amazon to being a top logistics provider without having to compete for***

2                 ***it***.[145]

3         192.     Amazon has leveraged its monopoly level of power in the realm of

4 e-commerce to "overtake[ ] the U.S. Postal Service in the large e-commerce parcel market,

5 and it's expected to surpass UPS and FedEx by 2022."[146]

6         193.     "Thanks to its market power over sellers, Amazon's logistics operation now

7 rivals the top carriers in scale. In 2019, Amazon delivered 2.5 billion parcels, or about

8 one-fifth of all e-commerce deliveries."[147]

9         194.     Amazon's violation of Section 2 of the Sherman Act has injured Plaintiffs and

10 Class Members by directly leading to higher prices for items that Plaintiffs and Class

11 Members purchased through Amazon's Buy Box.

12                      **VIII.  PRAYER FOR RELIEF**

13         195.     WHEREFORE, on behalf of themselves and the Class, Plaintiffs respectfully

14 request that this Court enter an Order:

15             a.      Certifying this case as a class action under Rule 23(a), (b)(2),

16                    and (b)(3) on behalf of the Class defined above, appointing

17                    Plaintiffs Angela Hogan and Andrea Seberson as

18                    representatives of the Class, and appointing their counsel as

19                    Class Counsel;

20             b.      Awarding Plaintiffs and Class Members treble damages under

21                    15 U.S.C. § 15(a);

22             c.      Awarding injunctive and other equitable relief as is necessary

23

24     [145] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 6.

       [146] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 2.

25     [147] Mitchell, et al., *Amazon's Monopoly Tollbooth*, *supra* note 32, at 8.

CONSOLIDATED AMENDED        – 61 –        TERRELL MARSHALL LAW GROUP PLLC
CLASS ACTION COMPLAINT                         936 North 34th Street, Suite 300
Case No. 2:21-cv-693-RSM                      Seattle, Washington 98103-8869
                                        TEL. 206.816.6603 • FAX 206.319.5450
                                              www.terrellmarshall.com

1    to protect the interests of the Class, including, among other

2    things, an order requiring Amazon to cease its unlawful tying

3    of access to the Buy Box to a Seller's purchase of Amazon

4    Fulfillment services;

5    d.    Awarding Plaintiffs and the Class their reasonable litigation

6    expenses and attorneys' fees;

7    e.    Awarding Plaintiffs and the Class pre- and post-judgment

8    interest, to the extent allowable; and

9    f.    Awarding such other and further relief as equity and justice

10    may require.

11    ## IX.   JURY DEMAND

12    196.    Plaintiffs demand a trial by jury on all issues so triable.

13

14    Dated: February 2, 2022          By: /s/Beth E. Terrell, WSBA #26759

15    Beth E. Terrell, WSBA #26759
Email: bterrell@terrellmarshall.com

16    Adrienne D. McEntee, WSBA #34061
Email: amcentee@terrellmarshall.com

17    TERRELL MARSHALL LAW GROUP

18    936 North 34th Street, Suite 300
Seattle, Washington 98103

19    Telephone: (206) 816-6603
Facsimile: (206) 319-5450

20

21

22

23

24

25

Kenneth A. Wexler, *Pro Hac Vice*
Email: kaw@wbe-llp.com.com

Justin N. Boley, *Pro Hac Vice*
Email: jnb@wbe-llp.com

Zoran Tasić, *Pro Hac Vice*
Email: zt@wbe-llp.com

**WEXLER BOLEY & ELGERSMA LLP**
55 West Monroe Street, Suite 3300
Chicago, Illinois 60603
Telephone: (312) 346 2222
Facsimile: (312) 346 0022

Daniel E. Gustafson, *Pro Hac Vice*
Email: dgustafson@gustafsongluek.com

Daniel C. Hedlund, *Pro Hac Vice*
Email: dhedlund@gustafsongluek.com

Michelle J. Looby, *Pro Hac Vice*
Email: mlooby@gustafsongluek.com

Daniel J. Nordin, *Pro Hac Vice*
Email: dnordin@gustafsongluek.com

**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622

Brett Cebulash, *Pro Hac Vice*
Email: bcebulash@tcllaw.com

Kevin Landau, *Pro Hac Vice*
Email: klandau@tcllaw.com

Evan Rosin, *Pro Hac Vice*
Email: erosin@tcllaw.com

**TAUS, CEBULASH & LANDAU, LLP**
80 Maiden Lane, Suite 1204
New York, NY 10038
Tel: (212) 931-0704
Fax: (212) 931-0703

*Attorneys for Plaintiffs and the Proposed Class*

CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
Case No. 2:21-cv-693-RSM

– 63 –