UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ANGELA HOGAN, *et al.*,<br><br>　　　　　　　　　　　Plaintiffs,<br><br>　v.<br><br>AMAZON.COM, Inc.,<br><br>　　　　　　　　　　　Defendants. | Case No. C21-996-RSM<br><br>ORDER GRANTING DEFENDANT AMAZON.COM, INC.'S MOTION TO DISMISS WITH LEAVE TO AMEND |

## I.  INTRODUCTION

This matter comes before the Court on Defendant Amazon.com, Inc. ("Amazon")'s Motion to Dismiss. Dkt. #26. Plaintiffs oppose Amazon's Motion. Dkt. #35. The Court has determined oral argument is unnecessary. For the reasons stated below, the Court GRANTS the Motion and dismisses Plaintiffs' claims with leave to amend.

## II.  BACKGROUND

For purposes of this Motion to Dismiss, the Court will accept all facts stated in the Consolidated Amended Class Action Complaint, Dkt. #23 (hereinafter, "Amended Complaint" or "Compl.") as true.

Defendant Amazon operates an online store, Amazon.com, in which it and other third-parties sell goods directly to consumers. Compl. ¶ 1. Plaintiffs allege that Amazon controls more

ORDER - 1

than 50% of the U.S. retail e-commerce market by dollar amount and is projected to control 73.5% of that market by 2026. *Id.* ¶¶ 4, 48. Moreover, 65 to 70% of all online retail transactions in the United States allegedly occur through Amazon. *Id.* ¶ 4, 185. Amazon also began participating in the logistics market when it launched Fulfillment by Amazon ("FBA") in 2006, a logistics service that provides warehousing, packing, and shipping to third-party sellers (referred to in the Amended Complaint as "Sellers"). *Id.* ¶ 13. Purportedly, the third-party sellers account for over 50% of the items purchased through Amazon.com. *Id.* Amazon's other competitors in the logistics industry include FedEx, UPS, and the U.S. Postal Service. *Id.* ¶ 14.

Third-party sellers on Amazon.com are technically not required to use FBA, however Amazon conditions a third-party seller's access to a "Prime Badge"—and with it, placement in the "Buy Box"—on the seller's purchasing FBA. *Id.* ¶ 20. The Prime Badge is associated with Amazon Prime—Amazon's first ever membership program unveiled in February 2005. *Id.* ¶ 2. At Amazon Prime's inception, an annual membership fee of $79 provided Prime members with unlimited two-day shipping at no extra cost and one-day shipping for $3.99 per item. *Id.* Plaintiffs estimate there are more than 140 million Prime members in the United States. *Id.* ¶ 4. The price for Prime membership, at the time Plaintiffs filed their Amended Complaint, was $12.99 per month. *Id.* ¶ 6. The Prime Badge appears next to products on Amazon's website that are eligible for free, fast shipping to Prime members. *Id.* ¶ 6. Plaintiffs allege that products offered by sellers with a Prime Badge are placed higher in Amazon's search results and are generally the only products featured in the Buy Box. *Id.* ¶ 19. The Buy Box is the section on the right side of an Amazon product detail page where customers can add a product to their cart or "buy now," and purportedly is how 90% of consumer purchases on Amazon.com are made. *Id.* ¶¶ 19

ORDER - 2

Plaintiffs Angela Hogan and Andrea Seberson are Amazon Prime members. *Id.* ¶¶ 42–43. Ms. Hogan has had an Amazon Prime membership for most of the past seven years and in that time has purchased items from Amazon and third-party sellers on Amazon.com including toiletries, consumer electronics, clothing, home wares, and jewelry. *Id.* ¶ 42. Ms. Seberson has had an Amazon Prime membership for a number of years and during that time has also made numerous purchases through Amazon.com for items such as books, camping equipment, and garden supplies among others. *Id.* ¶ 43.

Plaintiffs filed their Amended Complaint on February 2, 2022, suing on behalf of a putative class of consumers who purchased goods on Amazon.com through the "Buy Box" that were packaged and shipped using FBA. *Id.* ¶ 151. Plaintiffs bring two antitrust claims for: (1) violation of Section 1 of the Sherman Act (15 U.S.C. § 1) – unlawful tying arrangement (hereinafter, the "Section 1" or "tying" claim); and (2) violation of Section 2 of the Sherman Act (15 U.S.C. § 2) – use of monopoly level of power to harm competition through tying scheme (hereinafter, the "Section 2" or "monopolization" claim). *Id.* ¶¶ 173–194.

Plaintiffs' tying claim is based on two distinct products offered by Amazon to third-party sellers: (1) the tying product – placement in the Buy Box; and (2) the tied product – FBA. *Id.* ¶ 175. Plaintiffs allege that "Amazon's economic power in the market for favorable placement on Amazon's website (the tying product)—and in the market for favorable product placement in e-commerce more broadly—was and is sufficient to coerce Sellers to purchase Amazon's Fulfillment services (the tied product)" and through this "anticompetitive scheme" Amazon has "decreased competition in the logistics market (the tied product market) and has put numerous competitors in that market out of business." *Id.* ¶¶ 177–178. As a result, Plaintiffs allege that "Amazon's unlawful tying arrangement has injured Plaintiffs and Class Members by directly

ORDER - 3

leading to higher prices for items that Plaintiffs and Class Members purchased through Amazon's Buy Box." *Id.* ¶ 182.

Plaintiffs' monopolization claim relates to Amazon's alleged monopoly level of market power in two markets (the tying product markets): (1) the online retail market in the United States (also referred to as the retail e-commerce market), in which Plaintiffs claim Amazon controls about 65% to 70% of all marketplace sales, and (ii) the market for placement in Amazon's Buy Box, over which Amazon purportedly has complete control. *Id.* ¶ 185. Plaintiffs allege that "Amazon used its power in one or both these markets to foreclose competition, to gain a competitive advantage, or to destroy competitors in the United States market for logistics services for retail goods (the tied-product market)—namely, the warehousing, packing, and shipping of retail goods." *Id.* ¶ 188. Specifically, Plaintiffs allege that "[b]y tying a Seller's access to the Buy Box to a Seller's purchasing FBA, Amazon has used its monopoly level of power to force many Sellers who would otherwise prefer a different logistics provider to instead pay for Amazon's Fulfillment services." *Id.* ¶ 189. As a result, Plaintiffs claim that Amazon has "injured Plaintiffs and Class Members by directly leading to higher prices for items that Plaintiffs and Class Members purchased through Amazon's Buy Box." *Id.* ¶ 194.

### III. DISCUSSION

**A. Legal Standard**

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for failure to state a claim. The court must assume the truth of the complaint's factual allegations and credit all reasonable inferences arising from those allegations. *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007). A court "need not accept as true conclusory allegations that are contradicted by documents referred to in the complaint." *Manzarek v. St. Paul Fire & Marine*

ORDER - 4

*Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Instead, the plaintiff must point to factual allegations that "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The complaint avoids dismissal if there is "any set of facts consistent with the allegations in the complaint" that would entitle the plaintiff to relief. *Id.* at 563, 127 S.Ct. 1955; *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

**B. Analysis**

Amazon moves to dismiss Plaintiffs' claims, alleging various grounds for dismissal: (1) Plaintiffs lack antitrust standing; (2) Plaintiffs fail to allege a Section 1 tying claim because they do not identify separate, tied products; (3) Plaintiffs fail to allege a Section 1 tying claim because they fail to allege market power in the tying product market or that any purchaser was "coerced" into purchasing the tied product; (4) Plaintiffs fail to allege a Section 1 tying claim because they fail to show sufficient anticompetitive effects in the tied product market (5); Plaintiffs fail to allege a Section 2 monopolization claim because they do not allege actionable anticompetitive conduct; (6) Plaintiffs fail to allege a Section 2 monopolization claim because they do not allege monopoly power in the relevant market; and (7) Plaintiffs' claims are time-barred. Dkt. # 26 at 6–22. The Court addresses antitrust standing first and, for the reasons explained below, finds that Plaintiffs lack antitrust standing to bring their tying and monopolization claims as pled. Because Plaintiffs' claims fail without antitrust standing, the Court does not address Amazon's other arguments in this Order.

Amazon claims that Plaintiffs' Sherman Act claims must be dismissed because Plaintiffs lack antitrust standing. Dkt. #26 at 14. "Antitrust standing is distinct from Article III standing." *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008) (citation omitted). A plaintiff

ORDER - 5

who satisfies the constitutional requirement of injury in fact is not necessarily a proper party to bring a private antitrust action. *See, e.g., City of Oakland v. Oakland Raiders*, 20 F.4th 441, 452–53, 455 (9th Cir. 2021) (finding Article III standing but not antitrust standing). In *Associated General Contractors of California v. California State Council of Carpenters* ("*AGC*"), 459 U.S. 519 (1983), the Supreme Court identified the factors a court must consider to determine whether plaintiffs have standing to bring an antitrust claim: (1) whether the plaintiffs suffered "antitrust injury," i.e., the type of injury the antitrust laws were intended to prevent; (2) the directness of the injury; (3) the speculative nature of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages. *City of Oakland*, 20 F.4th at 455 & n.10. Further, in *Illinois Brick Co. v. Illinois,* the Supreme Court adopted a bright-line rule that indirect purchasers may not bring private antitrust damage claims. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 723–26, 745–47 (1977). Specifically, the *Illinois Brick* rule precludes "indirect purchasers in a chain of distribution ... from suing for damages based on unlawful overcharges passed on to them by intermediates in the distribution chain who purchased directly from the alleged antitrust violator." *State of Ariz. v. Shamrock Foods Co.*, 729 F.2d 1208, 1211–12 (9th Cir. 1984) (citing 431 U.S. at 746, 97 S.Ct. 2061); *see also Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 545, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (applying the *Illinois Brick* rule based on "the problems of identifying damages and apportioning them among directly victimized contractors and subcontractors and indirectly affected employees and union entities"). Amazon asserts that Plaintiffs lack standing under both *AGC* and *Illinois Brick*. Dkt. #26 at 14.

As to the first *AGC* factor, a "showing of antitrust injury is necessary, but not always sufficient, to establish standing." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5

ORDER - 6

(1986). Antitrust injury requires "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *City of Oakland*, 20 F.4th at 456. Furthermore, in assessing alleged antitrust injuries, courts must focus on anticompetitive effects "in the market where competition is [allegedly] being restrained." *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999)). "Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *Id.*

Amazon argues that Plaintiffs' Sherman Act claims both fail because they are not purchasers in the market in which competition was allegedly restrained. For Plaintiffs' tying claim, Amazon argues that Plaintiffs assert anticompetitive harm in the market for fulfillment or logistics services pointing out that the Amended Complaint describes the tying product as "placement in the Buy Box" (Featured Offer), the tied product as "Fulfillment by Amazon," and the alleged market in which the tied product competes as the "market for logistics for retail goods in the United States—namely, the warehousing, packing, and shipping of retail goods." Dkt. #26 at 15 (citing Compl. ¶ 175). As pled, Amazon argues that Plaintiffs do not purchase the tied product as they "are not retailers who purchase logistics services for the warehousing, packing, and shipping of their goods. Rather, Plaintiffs allege they purchased 'items' ([Compl.] ¶ 182) such as 'skin care products, shampoo, consumer electronics, clothing, children's toys, child-proof cabinet locks, stroller accessories, bedding, kitchen supplies, eating utensils, drinkware, skateboarding equipment, and jewelry' ([Compl.] ¶ 42)." Amazon argues this is fatal because "[t]he key question in an illegal tying claim is whether the plaintiff purchased the tied product from the antitrust defendant." Dkt. #26 at 16 (emphasis removed) (quoting *Warren Gen. Hosp.*

ORDER - 7

*v. Amgen Inc.*, 643 F.3d 77, 88 (3d Cir. 2011); *accord Lakeland Reg'l Med. Ctr., Inc. v. Astellas US, LLC*, 763 F.3d 1280, 1289 (11th Cir. 2014)).  Amazon argues that because Plaintiffs do not allege that they purchased the allegedly tied product—FBA—they cannot possibly have suffered antitrust injury.  Amazon asserts Plaintiffs' monopolization claim fails for the same reason, because their monopolization claim is also based on harm in the allegedly tied product market: "logistical services for retail goods."  Dkt. #26 at 16 (quoting Compl. ¶ 188).  And, as with the tying claim, the harm alleged in a monopolization claim must occur in the allegedly monopolized market.  *Id.* (citing *Qualcomm*, 969 F.3d at 992).  But, again, the Amended Complaint does not allege that end consumers such as Plaintiffs purchase fulfillment/logistics services—instead, they purchase retail goods—thereby failing to allege antitrust injury.  *Id.* (citing Compl. ¶¶ 20, 22, 24–25).

In response, Plaintiffs assert that they are participants in the fulfillment/logistics market because Plaintiffs themselves purchase FBA.  In support, Plaintiffs cite to the Amazon Services Business Solutions Agreement (Dkt. #36, Ex. 1).[1]  Plaintiffs point to Section S-4 and S-5 of the Amazon Services Business Solutions Agreement. Dkt. #35 at 7–8.  Section S-5 states in relevant part: "[Amazon] will remit to you [,the third-party seller,] your available balance…[f]or each remittance, your available balance is equal to any Sales Proceeds not previously remitted to you . . . .[,]" while Section S-4 clarifies that: "Sales Proceeds will not include any shipping charges set by us in the case of Your Transactions that consist solely of products fulfilled using Fulfillment by Amazon." Dkt. #36-1 at 23–24.  In response, Amazon points to Section F-9.1 of

---

[1] Plaintiffs argue that the Amazon Services Business Solutions Agreement is both incorporated by reference into the Amended Complaint and is the proper subject of judicial notice. Dkt. #35 at 5 n.5, 7–8. Plaintiffs cite to Paragraphs 49–50 of their Amended Complaint as support for their incorporation by reference argument.  The Court finds it entirely unclear how the paragraphs Plaintiffs reference as support for incorporation by reference have anything to do with the Amazon Services Business Solutions Agreement. However, the Court will consider the Amazon Services Business Solutions Agreement because it meets the standards for judicial notice set forth in Fed. R. Evid. 201(b).

ORDER - 8

the Amazon Services Business Solutions Agreement titled Handling and Storage Fees, which states: "You [, the third-party seller,] will pay [Amazon] the applicable fees described in the applicable Fulfillment by Amazon Fee schedule." Dkt. #36-1 at 34.  In reading these sections of the Amazon Services Business Solutions Agreement, the Court finds that the Amazon Services Business Solutions Agreement does not establish Plaintiffs pay Amazon for FBA.  The Court agrees with Amazon that Plaintiffs' Amended Complaint is, instead, replete with allegations that third-party sellers, and not Plaintiffs, purchase FBA.  Dkt. #38 at 2 (citing *e.g.*, Compl. ¶¶ 24–26, 42–43, 129–136, 151, 182, 194)).

Plaintiffs also argue that regardless of the Amazon Services Business Solutions Agreement, Plaintiffs must purchase FBA when they purchase Amazon products on Amazon.com, i.e., transactions that do not involve a third-party seller.  Dkt. #35 at 6–8.  In response, Amazon points out that Plaintiffs' Amended Complaint alleges that Plaintiffs do not pay for shipping.  The Amended Complaints states that both Plaintiffs are Amazon Prime members (Compl. ¶¶ 42–43), and therefore receive "free, fast shipping" of any product with a Prime Badge ( *Id.* ¶ 6).  And according to the Amended Complaint, all products shipped through FBA receive the Prime Badge. *Id.* ¶ 80(iii); *see also* ¶¶ 19–20.  Further, Plaintiffs' claims pertain only to items purchased through the Featured Offer (¶¶ 151, 182, 194), and, at least according to the Amended Complaint, "only products with the Prime Badge are offered through the [Featured Offer]." *Id.* ¶ 24.  Amazon argues that this must mean, for every relevant sale regardless of the seller, Plaintiffs allege they purchased a Prime-badged product and received free shipping.  Indeed, every example the Amended Complaint provides of the consumer-side shipping cost for items in the Featured Offer shows that the consumer received "FREE delivery."  Dkt. #38 at 3 (citing Compl. ¶¶ 120–122).  Amazon argues that despite Plaintiffs' assertions that FBA shipping

ORDER - 9

charges are paid directly by the consumer, the Amended Complaint reveals that Plaintiffs paid no such charges. The Court agrees that taking Plaintiffs' Amended Complaint as true, it does not see room for argument that Plaintiffs somehow directly paid for FBA shipping charges themselves.

Plaintiffs also argue that the Supreme Court's decision in *Apple v. Pepper*, 139 S. Ct. 1514 (2019) salvages their claims because the charges for FBA shipping are akin to markups which are ultimately borne by Plaintiffs. In *Pepper*, consumers brought an antitrust class action against Apple, Inc. ("Apple") alleging that Apple attempted to monopolize the market for smartphone apps. 139 S. Ct. at 1520. The sole question before the Supreme Court was whether the consumers were proper plaintiffs for that particular antitrust suit—in particular whether the consumers were "direct purchasers" of the monopolized product (the iPhone apps) from Apple such that under *Illinois Brick* they had antitrust standing for alleged monopolization. The Supreme Court found:

> In this case, unlike in *Illinois Brick*, the iPhone owners are not consumers at the bottom of a vertical distribution chain who are attempting to sue manufacturers at the top of the chain. There is no intermediary in the distribution chain between Apple and the consumer. The iPhone owners purchase apps directly from the retailer Apple, who is the alleged antitrust violator. The iPhone owners pay the alleged overcharge directly to Apple. The absence of an intermediary is dispositive. Under *Illinois Brick*, the iPhone owners are direct purchasers from Apple and are proper plaintiffs to maintain this antitrust suit.

*Id.* at 1521. The Court does not find that *Pepper* saves Plaintiffs' claims—they still have not established antitrust standing. Unlike in *Pepper*, where plaintiffs purchased the allegedly monopolized product (iPhone apps), here Plaintiffs did not pay for the allegedly monopolized product (logistic services, specifically FBA).

Finally, Plaintiffs argue that they have antitrust injury because the Supreme established in *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) that "the market participant

ORDER - 10

requirement can also be satisfied by showing that plaintiffs' injuries were 'inextricably intertwined' with the injuries of the actual market participants." Dkt. #35 at 9–10 (quoting *In re WellPoint, Inc. Out-of Network "UCR" Rates Litig.*, No. MDL 09-2074 PSG (FFMx), 2013 U.S. Dist. LEXIS 208787, at *27 (C.D. Cal. July 19, 2013) (citations omitted). Here, Plaintiffs argue, "Plaintiffs' injuries (paying supracompetitive prices for items shipped using FBA) are inextricably intertwined with the injuries inflicted by Amazon on third-party Sellers (being forced to use the more expensive and inferior Amazon Fulfillment services to gain access to the Buy Box)." *Id.* at 10. In *McCready*, the plaintiff purchased the product (a restrictive health-insurance policy) that formed the basis of the alleged conspiracy. *McCready*, 457 U.S. at 468. The plaintiff had a health plan that paid for psychotherapy services rendered by psychiatrists but not psychologists, and alleged that the health insurer had engaged in a conspiracy with a psychiatrists' organization to prevent psychologists' entry into the market. *Id.* at 467–70. The Court held the plaintiff could bring suit under Section 4 of the Clayton Act despite not herself being one of the affected competitors, i.e., a psychologist. *Id.* at 478–79. Because denying coverage to consumers was the "very means" through which the conspirators allegedly effected the scheme, plaintiff's injuries were "inextricably intertwined" with the anticompetitive harm. *Id.* at 479, 484. Amazon argues that Plaintiffs' allegations are not analogous to those held sufficient in *McCready*, as it would be third-party sellers—not consumers—that sit in the position analogous to the *McCready* plaintiff: Sellers are the entities that allegedly would be purchasing from logistics competitors absent the conduct. The Court agrees. Plaintiffs once again fail to recognize that the tied product at issue is the FBA charges—Plaintiffs do not dispute this or attempt to argue otherwise in their response.

ORDER - 11

For these reasons, the Court finds that Plaintiffs lack antitrust injury as pled. Because antitrust injury is a necessary finding for antitrust standing, Plaintiffs' Sherman Act claims must fail, and the Court need not analyze the remaining *AGC* factors. As Amazon argues, Plaintiffs are at best indirect purchasers and would be precluded from bringing antitrust claims by the bright-line rule established in *Illinois Brick* that authorizes suits by *direct* purchasers but bars suits by *indirect* purchasers. *See Illinois Brick*, 431 U.S. at 746.

## IV.   CONCLUSION

Having reviewed the relevant pleading and the remainder of the record, the Court hereby finds and ORDERS:

1) Defendant's Motion to Dismiss (Dkt. #26) is GRANTED.

2) Plaintiffs' Amended Complaint is DISMISSED WITHOUT PREJUDICE with leave to amend.

3) Plaintiffs shall have thirty (30) days to file a second amended complaint. If Plaintiffs fail to do so, this case will be closed.

DATED this 20th day of April, 2023.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER - 12