UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ANGELA HOGAN and ANDREA SEBERSON, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMAZON.COM, Inc.,<br><br>Defendant. | CASE NO. 2:21-cv-00996-JHC<br><br>ORDER |

# I

## INTRODUCTION

This antitrust matter comes before the Court on Defendant Amazon.com, Inc.'s Motion to Dismiss the Second Amended Complaint. Dkt. # 49. Plaintiffs allege that Defendant violated Sections 1 and 2 of the Sherman Act. Dkt. # 44 ¶ 26. They say that Defendant forced third-party sellers to purchase Amazon's shipping and fulfillment services—known as Fulfillment by Amazon (FBA)—by leveraging its power over product placement on Amazon's online retail marketplace, and on the internet more broadly. *Id.* Plaintiffs are consumers—not third-party sellers—who say that this alleged anticompetitive conduct led to higher prices. But the Second Amended Complaint (SAC) does not allege harm in the market where competition was allegedly

ORDER - 1

restrained, and thus does not sufficiently allege antitrust injury.  *See Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020).  Nor does the SAC define any relevant market for Amazon's Buy Box.  *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018).  Thus, the Court GRANTS the motion and DISMISSES the SAC with prejudice.

## II

### BACKGROUND

Plaintiffs Angela Hogan and Andrea Seberson are Amazon Prime members.  Dkt. # 44 ¶¶ 47, 48.  They allege that they paid supra-competitive prices for products they bought on Amazon's online marketplace because of the company's anticompetitive behavior in the shipping and fulfillment market.  *Id.* ¶¶ 46, 47, 48.

Plaintiffs argue that Amazon violated Sections 1 and 2 of the Sherman Act by "leveraging of its market power in e-commerce to attain dominance in the logistics market." *Id.* ¶ 43.  They say that Defendant unlawfully tied its shipping service, FBA, to preferential placement of products in the Buy Box on Amazon's online marketplace.  *Id.*  Plaintiffs allege that they were "injured by Amazon because, as a direct result of Amazon's anticompetitive actions [they were] overcharged for numerous items [they] purchased through the Buy Box." *Id.* ¶¶ 47, 48.

Plaintiffs allege that:

- Amazon operates an online marketplace where "65% to 70% of all online retail transactions in the United States occur." *Id.* ¶ 6.  The Amazon marketplace lists items sold by Amazon and items sold by third-party sellers.  *Id.* ¶ 37.
- The Buy Box, or Featured Offer, "is a section on the right side of an Amazon product detail page [on Amazon's online marketplace] where customers can add

ORDER - 2

a product to their cart or 'buy now.'" *Id.* ¶ 9. When multiple sellers offer the same product, Buy Box features one of the offers. *Id.* ¶ 65. While Amazon's marketplace allows customers to view the non-featured offers, 90% of sales on Amazon are through the Buy Box. *Id.* ¶ 67. Thus, placement in the Buy Box is very important to third-party seller success on Amazon's marketplace. *Id.* ¶ 67.

- FBA is "a logistics service that provides warehousing, packing, and shipping to third-party sellers" on Amazon's online marketplace. *Id.* ¶ 15.

- Amazon Prime is a membership subscription offered by Amazon, through which members pay a monthly fee and one benefit is "free" shipping for products that are shipped with FBA. *Id.* ¶ 2. Amazon forces third-party sellers to buy FBA even though it is more expensive than comparable services from competitors. *Id.* ¶¶ 27, 36. "To force Sellers to switch to its Fulfillment services, Amazon conditioned a Seller's access to the Prime Badge—and with it, placement in the Buy Box—on a Seller's using Fulfillment by Amazon." *Id.* ¶ 22.

- While use of FBA does not guarantee placement in the Buy Box, Amazon designed the Buy Box algorithm so that a seller's use of FBA is "the variable that has the greatest impact on" a seller's placement in the Buy Box. *Id.* ¶ 24. "[A]pproximately 85% of the top 10,000 Amazon Sellers—and 73% of Sellers worldwide—use FBA." *Id.* ¶ 89. Some sellers would prefer to use other shipping and fulfillment services but choose FBA to obtain access to the Buy Box and Amazon Prime customers. *Id.* ¶ 86. "Amazon's power in the e-commerce market has allowed it to sharply raise the fees for its Fulfillment services over time. The company's revenues from its logistics business grew from approximately $3 billion in 2014 to $29 billion in 2019." *Id.* ¶ 98. This

ORDER - 3

- growth was driven by increased fees instead of an increase in the number of customers. *Id.* ¶ 99.

- Because of these rising costs, sellers raise prices of the products that they sell on Amazon's online marketplace. *Id.* ¶ 134.

Another judge of this court dismissed the First Amended Complaint (FAC) without prejudice, concluding that Plaintiffs did not allege antitrust standing. Dkt. # 41 at 1. The order reasons that the FAC does not sufficiently allege that Plaintiffs "directly paid for FBA shipping charges." Dkt. # 41 at 10. It concludes that the FAC shows that Plaintiffs are indirect purchasers, precluded from bringing suit under *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977). Dkt. # 41 at 10. The matter was later reassigned to the undersigned judge.

In their SAC, Plaintiffs allege that: (1) shipping is a "two-sided market;" and (2) Plaintiffs, who are consumers, pay for shipping, either directly by subscribing to Amazon Prime or paying shipping fees, or indirectly by paying increased prices for goods. Dkt. # 44 ¶ 3, 4, 29, 156. Defendant now moves to dismiss the SAC. Dkt. # 49.

## III

### RULE 12(b)(6) STANDARDS

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." A motion to dismiss under this rule "tests the legal sufficiency of a claim." *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). In considering such a motion, a court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (internal citation and quotation omitted).

But the complaint must contain more than "[t]hreadbare recitals of the elements of a cause of action" and "mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## IV

### DISCUSSION

Defendant moves to dismiss the SAC for failure to state a claim as to Plaintiff's Sherman Act Section 1 and 2 claims. Dkt. # 49 at 10; *see* Fed. R. Civ. P 12(b)(6). Defendant argues that Plaintiffs did not suffer an antitrust injury because their alleged harm occurred in the online retail market, not the shipping market where they allege that Defendant's actions illegally restrained competition. Dkt. # 49 at 11. In the alternative, Defendant argues that the SAC does not contain sufficient allegations to define the market for the Buy Box. Dkt. # 49 at 21.[1] The Court agrees with both arguments.

A.   Antitrust Injury

To bring an antitrust claim under Section 1 or Section 2 of the Sherman Act, Plaintiff must allege antitrust injury. *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1159 (9th Cir. 2019) ("To plausibly plead a monopolization claim [Section 2 of the Sherman Act], plaintiffs must allege: "(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury."); *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012) (requiring plaintiffs to allege that they "were harmed by the defendant's anti-competitive contract,

---

[1] Given the Court's conclusions, it need not reach Defendant's other arguments about the sufficiency of the SAC.

ORDER - 5

combination, or conspiracy, and that this harm flowed from an 'anti-competitive aspect of the practice under scrutiny,'" which "is generally referred to as 'antitrust injury'"); *see also City of Oakland v. Oakland Raiders*, 20 F.4th 441, 456 (9th Cir. 2021) (noting that antitrust injury is "mandatory" to show antitrust standing, which is required for all Sherman Act claims by individuals).

To satisfy the antitrust injury requirement, a plaintiff must show "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1066–67 (9th Cir. 2015) (quoting *Glen Holly Entm't, Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1007–08 (9th Cir. 2003) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977))).

"[I]n assessing alleged antitrust injuries, courts must focus on anticompetitive effects '*in the market* where competition is [allegedly] being restrained.'" *Qualcomm Inc.*, 969 F.3d at 992 (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999) (emphasis added)). "Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *Id.*

Plaintiffs allege that Defendant's anticompetitive behaviors are restraining competition in the shipping market. Dkt. # 44 ¶¶ 43–45. Plaintiffs, who are consumers, allege that the shipping market is two-sided and that they purchase shipping on one side of the market from Amazon either (1) by paying for an Amazon Prime membership; (2) by paying shipping fees directly; or (3) by paying higher prices for "free" shipping. *Id.* ¶ 160, 161. They allege that third-party sellers on the other side of the market purchase FBA from Amazon. *Id.; see Ohio v. American Express*, 585 U.S. 529, 534, 544, 546 (2018) (holding that for *some* two-sided markets "courts

ORDER - 6

must include both sides of the platform . . . when defining the [] market" and "only one market should be defined"); *see also Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 985 (9th Cir. 2023) (holding that Apple's App Store is a two-sided transaction market in which the court needs to consider the "anticompetitive impact on the 'market as a whole,'" including the impact of the alleged anticompetitive conduct on both app developers and app buyers).

Plaintiffs appear to purchase shipping directly from Amazon. *See Apple, Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019) (holding that iPhone users purchase apps directly from Apple, who manages an app marketplace where third-party developers sell apps to iPhone users). But even if the market for shipping and the market for FBA are two sides of the same transaction market, Plaintiffs do not allege that they suffered an antitrust injury in this market.

Plaintiffs allege that Defendant engaged in anticompetitive conduct by "tying" access to the Buy Box to the purchase of FBA, thereby gaining an anticompetitive advantage in the shipping market by leveraging its power in the Buy Box market. *Id.* ¶ 26. But Plaintiffs are not subject to the tying arrangement. They have not alleged that they have any interest in purchasing the tying product—placement in the Buy Box. Their choice to purchase shipping through Amazon is not influenced by any tying arrangement that may exist between FBA and Buy Box.

Plaintiffs allege that they were injured by Defendant's anticompetitive behavior because they paid higher prices for products bought through Amazon's marketplace. *Id.* ¶ 102. This injury occurred in the online retail market, not in the shipping market. Plaintiffs do not allege that they paid more for their Amazon Prime membership or that they paid more for shipping in general. *See id.* Thus, although Plaintiffs allege that their injuries flow from the tying arrangement in the shipping market, they do not allege that they experienced antitrust injury in

ORDER - 7

the shipping market.  Because Plaintiffs do not allege that they suffered an antitrust injury, they fail to state a claim under Sections 1 and 2 of the Sherman Act.

B.      Market Definition

"A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'" *Qualcomm Inc.*, 969 F.3d at 992 (quoting *Am. Express Co.*, 585 U.S. at 543).  At the motion to dismiss phase for Sections 1 and 2 of the Sherman Act, "Plaintiffs must plead a relevant market to state an antitrust claim under the Sherman Act, unless they assert a *per se* claim." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018).  The requirements for defining a relevant market "apply identically under the two different sections of the Act." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044 n.3 (9th Cir. 2008); *see also Epic Games, Inc. v. Apple, Inc.*, 67 F.4th at 998 ("Where . . . the plaintiff challenges the same conduct pursuant to Sections 1 and 2, we can 'review claims under each section simultaneously.'" (quoting *Qualcomm*, 969 F.3d at 991)).

Defendant argues that the SAC fails to "describe a plausible tying product market" for the Buy Box.  Dkt. # 49 at 21.  Plaintiffs say that Amazon's tying arrangement is a per se violation of Section 1 and, in the alternative, argue that Amazon's anticompetitive conduct violated Sections 1 and 2 of the Sherman under the rule of reason.  Dkt. # 44 ¶ 187, Dkt. # 54 at 27–28.  Thus, first, the Court must consider whether the per se rule applies to the Section 1 claim.  Plaintiffs do not allege that the Section 2 monopoly claim is a per se violation, so the Court applies the default rule of reason to that claim.  *See California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1133 (9th Cir. 2011) ("The rule of reason is the presumptive or default standard.").

1.  Per se rule for technologically integrated tying claims

The per se rule "recognizes that '[a] small group of restraints are unreasonable *per se* because they always or almost always tend to restrict competition and decrease output.' 'Such agreements or practices are conclusively presumed to be unreasonable because of their pernicious effect on competition and lack of any redeeming virtue.'" *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1108–09 (9th Cir. 2021) (first quoting *Am. Express*, 585 U.S. at 540, then quoting *United States v. Joyce*, 895 F.3d 673, 676 (9th Cir. 2018)).

While tying arrangements are often per se violations, in *Epic Games, Inc. v. Apple, Inc.*, the Ninth Circuit held that "*per se* condemnation is inappropriate for ties 'involv[ing] software that serves as a platform for third-party applications.'" 67 F.4th at 997 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 84 (D.C. Cir. 2001)).

Here, the Buy Box is "technologically integrated" with FBA. *Id.* Plaintiffs allege that the connection between the two exists because the Buy Box algorithm favors products that are shipped using FBA, among other metrics. Dkt. # 44 ¶¶ 65, 111. Thus, the per se rule does not apply to this tying claim.

2.  Defining the market

Restraints of trade that are not per se unreasonable are assessed under the rule of reason. *Qualcomm Inc.*, 969 F.3d at 989. "The rule of reason requires courts to conduct a fact-specific assessment of 'market power and market structure . . . to assess the [restraint]'s *actual* effect' on competition." *Id.* (quoting *Am. Express*, 585 U.S. at 541).

Because the rule of reason applies to both Sherman Act claims, Plaintiffs must plausibly allege that a relevant market exists for the Buy Box. *See Hicks v. PGA Tour, Inc.*, 897 F.3d at

1120.  "An antitrust complaint [] survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect."  *Newcal Indus., Inc.*, 513 F.3d at 1045.

In *Newcal*, the Ninth Circuit identified some "legal principles that govern the definition of an antitrust 'relevant market' and a complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable."  *Id.*  First, "the relevant market must be a *product* market."  *Id.*  "Second, the market must encompass the product at issue as well as all economic substitutes for the product," unless the complaint alleges a cognizable single product market.  *Id.*  "Including economic substitutes ensures that the relevant product market encompasses 'he group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business.'"  *Hicks v. PGA Tour, Inc.*, 897 F.3d at 1120 (quoting *Newcal Indus., Inc.*, 513 F.3d at 1045).

The SAC alleges that there are two relevant markets for the Buy Box.  First, it alleges that the Buy Box is "a product or service in the market for favorable product placement on Amazon's website."  Dkt. # 44 ¶¶ 188, 199.  Plaintiffs argue that "the market for favorable placement on Amazon's website" is a "single-brand market."  Dkt. 54 at 25 (quoting Dkt. 44 ¶ 190).  Second, Plaintiffs allege that the Buy Box is "a product or service in the market for favorable product placement . . . on the internet more broadly."  Dkt. # 44 ¶ 188.

Defendant argues that the SAC fails to "describe a plausible tying product market" for the Buy Box.  Dkt. # 49 at 21.  It argues that the alleged single brand market is "implausible" because "single brand markets are only viable 'in the context of *aftermarkets*.'"  Dkt. # 49 at 22 n.8 (quoting *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1107 (N.D. Cal 2022)).

In *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, the Supreme Court held that "in some instances one brand of a product can constitute a separate market." 504 U.S. 451, 482 (1992). Neither the Supreme Court nor the Ninth Circuit has explicitly addressed whether single brand markets are limited to "aftermarkets." *See Eastman Kodak Co.*, 504 U.S. at 482 (directing to look at the "commercial realities' faced by consumers," in defining the market, instead of automatically limiting single brand markets to aftermarkets). In *Epic Games, Inc. v. Apple, Inc.*, the Ninth Circuit broadly recognized that "in some instances one brand of a product can constitute a separate market," without explicitly narrowing the single brand market to an "aftermarket." 67 F.4th at 976. *See also In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 344 (E.D.N.Y. 2019) ("It is important to make clear that single-brand market definitions are not formally limited to the aftermarket context."); *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) ("Single-brand markets are, at a minimum, extremely rare. . . . Antitrust markets consisting of just a single brand, however, are not *per se* prohibited; as stated, markets are defined by the 'reasonable interchangeability' of use or the cross-elasticity of demand among products. In theory, it may be possible that, in rare and unforeseen circumstances, a relevant market may consist of only one brand of a product."); *but see Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1108 (N.D. Cal. 2022) (rejecting Plaintiff's alleged single brand market: "Plaintiff does not cite a single antitrust case that has *ever* recognized a *single-brand primary market*").

While single brand markets are not favored, Plaintiffs could overcome the presumption against such markets if they alleged that the product is "so unique or so dominant in the market in which they compete" that there are no economic substitutes available to consumers. Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their*

ORDER - 11

*Application* ¶ 563. (Fourth and Fifth Editions 2018–2023) (quoting *Bushie v. Stenocord Corp.*, 460 F.2d 116,121 (9th Cir. 1972)); *Eastman Kodak Co.*, 504 U.S. at 482.

Here, the SAC does not meet the high burden to allege a plausible single product market because it lacks a sufficiently detailed description of the market. While the SAC alleges that Amazon has power over the Buy Box algorithm, it does not allege that the Buy Box as a product is "so unique" that there is no other product that competes with it. *See Bushie v. Stenocord Corp.*, 460 F.2d at 121. Thus, Plaintiffs fail to allege the existence of a plausible single brand market for the Buy Box.

As for a standard, multi-brand market, while the relevant market need not be defined with specificity in the complaint, a plaintiff must at least include economic substitutes to allege that a market exists. In *Hicks v. PGA Tour, Inc.*, the court noted that "[i]ncluding economic substitutes ensures that the relevant product market encompasses 'the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business.'" 897 F.3d at 1120 (quoting *Newcal Indus.*, 513 F.3d at 1045).

Here, the SAC does not plead sufficient facts to establish a multi-brand market for the Buy Box—allegedly "favorable product placement in e-commerce"—because it does not allege any economic substitutes for the Buy Box in the alleged market. Dkt. # 44 ¶ 190. The lack of economic substitutes means that the Court cannot even assess whether the "relevant market definition is facially unsustainable" because the contours of the alleged market are undefined. *Hicks v. PGA Tour, Inc.*, 897 F.3d at 1120.

Plaintiffs have thus failed to state a claim under Section 1 and 2 of the Sherman Act.

ORDER - 12

C.  Dismissal with Prejudice

Federal district courts, in their discretion, generally grant leave to amend "freely . . . when justice so requires." Fed. R. Civ. P. 15(a). When a party seeks leave to amend, a court considers the Supreme Court's *Foman* factors: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiffs do not seek leave to amend the SAC. *See* Dkt. # 54 at 34. But even if they did, dismissal with prejudice would still be appropriate here because the "complaint could not be saved by amendment" as the Court does not see how Plaintiffs can show antitrust injury in the shipping market. *Eminence Cap., LLC*, 316 F.3d at 1052.

V

CONCLUSION

For these reasons, the Court GRANTS Defendant's motion to dismiss, Dkt. # 49, and DISMISSES the SAC with prejudice.

Dated this 13th day of March, 2024.

John H. Chun
United States District Judge